865 A.2d 673

STATE OF NEW JERSEY, PLAINTIFF–RESPONDENT, v. ALEXANDER BRANCH, DEFENDANT–APPELLANT.

Argued October 12, 2004—Decided February 1, 2005.

*James K. Smith, Jr.*, Assistant Deputy Public Defender, argued the cause for appellant (*Yvonne Smith Segars*, Public Defender, attorney; *M. Virginia Barta*, Assistant Deputy Public Defender, on the letter brief).

*Joie Piderit*, Deputy Attorney General, argued the cause for respondent (*Peter C. Harvey*, Attorney General of New Jersey, attorney).

*Alexander Branch* submitted a supplemental letter in lieu brief *pro se.*

Justice ALBIN delivered the opinion of the Court.

The right of a party to confront witnesses in court is one of the principal values protected by the hearsay rule. The rule generally shields a party from damning out-of-court statements, which are offered for their truth but are not subject to the truth-testing rigors of cross-examination. Our evidentiary rules and case law recognize many exceptions to the hearsay rule that promote both the efficiency and the fact-finding integrity of trials. This appeal explores whether hearsay used by the State to convict defendant of burglary and robbery fell within legitimate exceptions to the hearsay rule.

In this case, a police detective testified that he included defendant's picture in a photographic array because he had developed defendant as a suspect "based on information received." The same detective also testified to the out-of-court descriptions of the burglar given by two non-testifying child victims. Defendant claims that the detective's testimony was inadmissible and highly prejudicial hearsay that denied him a fair trial. The Appellate Division affirmed defendant's convictions, finding that the detective followed the command of *State v. Bankston,* 63 *N.J.* 263, 307 *A.*2d 65 (1973), when he testified about the photographic array, and finding that the children's descriptions of the burglar were excited utterances admissible under *N.J.R.E.* 803(c)(2). We disagree and now reverse.

We hold that the detective's testimony that he developed a suspect based on information received from an unknown source was inadmissible hearsay that violated defendant's right of confrontation. We also hold that the one out-of-court description of the burglar that is truly in issue did not meet the definition of an excited utterance because the child-declarant had an "opportunity to deliberate" before making her statement.

I.

Defendant Alexander Branch was charged in a Union County indictment with second-degree burglary (*N.J.S.A.* 2C:18–2) and

second-degree robbery (*N.J.S.A.* 2C:15–1). During a three-day trial, the jury heard the following evidence. On April 22, 1998, at approximately 8:30 p.m., Kathleen O'Nieal was talking with a family friend, Joseph Gannon, in the television room of her Plainfield home when she heard screams coming from the upstairs bedroom of her seven-year-old twins, John and Juliana. Within moments, a light-skinned black man of medium build wearing a hooded sweatshirt and sucking on a lollipop appeared downstairs. O'Nieal and Gannon, both startled, shouted at the intruder and chased him into the kitchen. Once there, the intruder tried but was unable to open the back door. He turned and punched Gannon above the left eye, causing a gash, then managed to open the door, and fled.

During the tumult, the children raced downstairs, and John quickly called 911. Within minutes, City of Plainfield Police Officer Daniel Kollmar arrived at the house and interviewed Gannon, O'Nieal, and the children. Police officers, with the assistance of a K–9 unit, also canvassed the immediate neighborhood but were unable to apprehend the intruder. Juliana told Officer Kollmar that she was asleep in her bedroom when she awoke to the sight of an intruder in the hallway. She screamed, prompting the intruder to enter her bedroom and place his hand over her mouth. At that point, her brother John awoke and the burglar moved towards him, slapping the side of his face, which left a reddish mark. Juliana and John observed the intruder touching the hallway walls, a stocking, and a purse hanging on the doorknob.

Before Officer Kollmar's arrival, Juliana had told much the same story to her mother. Juliana mentioned to her mother that the intruder had touched her piggy bank and asked where he could find her mother's purse. After covering her mouth, the intruder smacked John in the face when he began to scream. Both children ran towards the stairs, but were passed by the intruder.

Approximately ten minutes after the police first received the 911 call, Detective Jean Calvin arrived at the house, where he spoke with Officer Kollmar, O'Nieal, Gannon, and the children. Detective Calvin testified that the children told him that they saw a "tall black male" in their bedroom and that Juliana asked the intruder, "'Who are you?'" The intruder responded by placing his hand over her mouth and telling her to "keep quiet." According to Calvin, "[a]t that time John said he started screaming and the tall black male smacked him in the face and told him to keep quiet." The children told Calvin that the intruder had touched a ceramic piggy bank and a small purse, and that he had run his hands across the hallway wall. Juliana informed the detective that the intruder had "a gap between his teeth" and dirty hands. The children's statements to O'Nieal, Kollmar, and Calvin were admitted as "excited utterances" pursuant to *N.J.R.E.* 803(c)(2). The children were not called as witnesses because, as their mother testified, they had "been through enough."

In his trial testimony, Gannon described the intruder as a light-skinned black man of medium build in his thirties with short-cropped hair and "little to no facial hair." Gannon estimated that the intruder, who was wearing sneakers, blue jeans and a dark sweatshirt, was five feet ten inches tall or "a little taller." Shortly after the burglary, however, Gannon told the police that the intruder was in his mid-twenties. O'Nieal, in her testimony, gave a similar physical description of the intruder. She stated that the man was "about five-ten or -eleven" and "could have been any-where from late twenties to mid-thirties, late thirties." O'Nieal said that she did not "really notice any facial hair," but if there was any, "it was light." A week after the burglary, in a sworn statement, O'Nieal told the police that the intruder had "no facial hair."

On the night of the burglary, every part of O'Nieal's house where the intruder may have had contact was dusted for finger-prints. The next day, detectives returned to the house and dusted for more fingerprints. Not one identifiable fingerprint lifted from

the house matched any of defendant's. The next day, Gannon met with a State Police artist who produced a sketch based on Gannon's description. A week later, Detective Francis Wilson displayed separately for Gannon and O'Nieal a photographic array of six black men without facial hair. Neither could identify the intruder from any of the photographs.

The next day, May 1, 1998, Detective Calvin separately showed Gannon and O'Nieal another photographic array, this time of six black men with facial hair. Both Gannon and O'Nieal independently selected defendant's photograph as that of the intruder. At trial, both identified defendant in court as the man who had broken into O'Nieal's home.

That day, the police arrested defendant, a forty-year-old medium-to-dark complexioned black man who had an afro-style hairdo, a beard, and a thick, full mustache and who stood approximately six feet four inches or six feet five inches tall.[1] The police sketch did not resemble either defendant on the day of his arrest or the photograph of defendant selected by O'Nieal and Gannon.[2] Defendant had dirty hands, consistent with his trade as a handyman, and a gap in his teeth. Defendant provided the following information in a signed statement to Detective Wilson. At the time of his arrest, he had been in the business of home repair and gutter cleaning for more than ten years. On April 22, at approximately 8 p.m., he and Paul Bennett were doing siding work at a Plainfield home owned by the proprietor of a deli and liquor store. As was his routine that week, defendant arrived at work mid-morning and left at about 9:15 or 9:30 p.m., walking from the job site to his apartment on West Front Street.

---

[1] A police photograph taken of defendant thirteen days after the burglary shows that defendant had an afro-style hairdo and substantial facial hair, including a thick mustache.

[2] At trial, Gannon said that he did not think that the sketch looked like the intruder at the time it was made. He did not say anything about this at the time and mentioned it for the first time at trial.

Defendant called as witnesses Clara Anderson and her son Richard, both of whom had known him for twenty-five years. They testified that on the evening of the burglary defendant was cutting down a tree in their yard. Richard and his mother recalled that defendant had a mustache and beard at the time. Richard also remembered that defendant was missing a front tooth.[3]

In addition, defendant called as witnesses a retired Newark Fire Department detective, Gerald Highsmith, and a Plainfield Police Officer, Stanton Williams. Highsmith testified that shortly after 9 p.m. on April 22, defendant showed up at Highsmith's Plainfield home to chat with him. Highsmith stated that defendant had a beard and mustache and that defendant's appearance at his front door was no different than his appearance in court. Officer Williams testified that when he saw defendant, either on the day of or the day after the burglary, defendant had facial hair and a "short afro" hairstyle. Both Highsmith and Williams estimated that defendant stood six feet four inches tall.

The jury convicted defendant of second-degree burglary and second-degree robbery. The trial court sentenced defendant on those convictions to concurrent ten-year State Prison terms with five-year parole disqualifiers. The Appellate Division affirmed the conviction. We granted certification, *State v. Branch,* 179 *N.J.* 307, 845 *A.*2d 133 (2004), and now reverse.

## II.

### A.

The State's case rested primarily on O'Nieal's and Gannon's identification of defendant as the burglar because of the

---

[3] Mrs. Anderson, however, earlier had told a defense investigator that she did not remember whether or not defendant was at her house on the particular evening of April 22, 1998 because he had performed work at her home on a number of days.

complete lack of physical evidence linking defendant to the crime. Immediately preceding Detective Calvin's testimony concerning the photographic identifications made by O'Nieal and Gannon, the jury learned that not one identifiable fingerprint lifted from the victims' home matched defendant's. Detective Calvin then gave his reason for placing defendant's picture in the photographic array in response to the prosecutor's questioning:

Q: Now, after that day, after April 22nd, 1998, *based on information received did you develop a suspect in this case?*

A: *Yes, I did.*

Q: *And who was that person?*

A: *Mr. Alexander Branch.*

Q: And did you obtain a photo array containing Alexander Branch's photograph?

A: Yes, ma'am.

Q: And did you arrange for the witnesses Kathleen O'Nieal and Joseph Gannon to look at that photo array?

A: Yes, I did.[4]

[(Emphasis added.)]

Defendant argues that the detective's hearsay testimony fell into no exception to the hearsay rule, violated his federal and state constitutional confrontation rights, and led the jury to the inescapable conclusion that a non-testifying declarant had implicated him in the crime. The State responds that the detective followed the command of *Bankston, supra,* when he testified that he acted "based on information received" to explain that he did not proceed with the photographic identification in an arbitrary manner.

From the quoted colloquy, we know that Detective Calvin received the "information" making defendant a suspect in the crime before O'Nieal and Gannon identified defendant's photograph from the array. We also know that there was no trial testimony or evidence, other than those identifications, that could have led Calvin to focus on defendant as a suspect. Thus, the jury

---

[4] Detective Wilson also was asked by the prosecutor if he "develop[ed] a suspect in this case" before he had shown the first array to Gannon and O'Nieal. Wilson answered that he had developed a suspect and that he placed that person's picture into a photo array, but that no identification was made.

was left to speculate that the detective had superior knowledge through hearsay information implicating defendant in the crime. Because the nameless person who provided the "information" to Calvin was not called as a witness, the jury never learned the basis of that person's knowledge regarding defendant's guilt, whether he was a credible source, or whether he had a peculiar interest in the case. Defendant never had the opportunity to confront that anonymous witness and test his credibility in the crucible of cross-examination.

Both the hearsay rule and the right of confrontation protect a defendant from the incriminating statements of a faceless accuser who remains in the shadows and avoids the light of court. There was no legitimate need or reason for Detective Calvin to tell the jury why he placed defendant's picture in the photographic array. The only relevant evidence was the identification itself. We now determine that Calvin's gratuitous hearsay testimony violated defendant's federal and state rights to confrontation as well as our rules of evidence.

### B.

The Sixth Amendment to the United States Constitution and Article I, Paragraph 10 of the New Jersey Constitution guarantee a criminal defendant the right to confront "the witnesses against him." *U.S. Const.* amend. VI; *N.J. Const.* art. I, ¶ 10. The right of confrontation is an essential attribute of the right to a fair trial, requiring that a defendant have a " 'fair opportunity to defend against the States accusations.' " *State v. Garron,* 177 *N.J.* 147, 169, 827 *A.2d* 243, 256 (2003) (quoting *Chambers v. Mississippi,* 410 *U.S.* 284, 294, 93 *S.Ct.* 1038, 1045, 35 *L.Ed.2d* 297, 308 (1973)), *cert. denied,* 540 *U.S.* 1160, 124 *S.Ct.* 1169, 157 *L.Ed.2d* 1204 (2004). A defendant exercises his right of confrontation through cross-examination, which has been described as the " 'greatest legal engine ever invented for the discovery of truth.' " *California v. Green,* 399 *U.S.* 149, 158, 90 *S.Ct.* 1930, 1935, 26 *L.Ed.2d* 489, 497 (1970) (quoting 5 *Wigmore*

§ 1367); *see also Pointer v. Texas,* 380 *U.S.* 400, 404, 85 *S.Ct.* 1065, 1068, 13 *L.Ed.*2d 923, 926 (1965).

The Confrontation Clause does not condemn all hearsay. *Crawford v. Washington,* 541 *U.S.* 36, 124 *S.Ct.* 1354, 1364, 158 *L.Ed.*2d 177 (2004). An established and recognized exception to the hearsay rule will not necessarily run afoul of the Confrontation Clause. *See, e.g., Crawford, supra,* 124 *S.Ct.* at 1367 n. 6. A defendant's confrontation right must accommodate " 'legitimate interests in the criminal trial process,' " such as established rules of evidence and procedure designed to ensure the efficiency, fairness, and reliability of criminal trials. *Garron, supra,* 177 *N.J.* at 169, 827 *A.*2d at 256 (quoting *Chambers, supra,* 410 *U.S.* at 295, 302, 93 *S.Ct.* at 1046, 1049, 35 *L.Ed.*2d at 309, 313). In this case, the hearsay elicited from Calvin does not fall within any exception to the hearsay rule, did not advance the fairness and reliability of the proceedings, and does not find support in our case law.

In *Bankston, supra,* we reversed the defendant's narcotics conviction because a detective's hearsay testimony led to the "inescapable inference" that the detective received information from an unknown source implicating the defendant in the crime. 63 *N.J.* at 271, 307 *A.*2d at 69. In *Bankston, supra,* detectives entered a tavern and found sixteen glassine envelopes of heroin on the bar under a pair of gloves near where the defendant had been seated. *Id.* at 265, 307 *A.*2d at 66. Defendant was arrested based on this discovery. *Ibid.* At trial, the court permitted a detective to testify that the defendant fit the description of the person for whom the police were looking. *Id.* at 266–67, 307 *A.*2d at 67.

We held that "[w]hen the logical implication to be drawn from the testimony leads the jury to believe that a non-testifying witness has given the police evidence of the accused's guilt, the testimony should be disallowed as hearsay." *Id.* at 271, 307 *A.*2d at 69. In that case, the "jury was led to believe that an unidentified informer, who was not present in court and subjected to cross-examination," told the police that the defendant was involved in a crime. *Ibid.* We explained that on the facts in *Bankston,*

*supra*, there would have been no violation of the hearsay rule had the detective testified that he entered the tavern " 'upon information received,' " for the purpose of dispelling any notion that he was acting in an arbitrary manner. *Id.* at 268, 307 *A*.2d at 68. That formulation, given those facts, would not have cast unfair suspicion on the defendant. *Id.* at 272, 307 *A*.2d at 69–70. *Bankston, supra,* makes clear that both the Confrontation Clause and the hearsay rule are violated when, at trial, a police officer conveys, directly or by inference, information from a non-testifying declarant to incriminate the defendant in the crime charged. *Id.* at 268–69, 307 *A*.2d at 67–68.

In *State v. Irving,* a case not unlike the present one, we applied the precepts discussed in *Bankston, supra.* 114 *N.J.* 427, 444–48, 555 *A*.2d 575, 584–86 (1989). In *Irving, supra,* a detective testified regarding his preparation of a photographic array that was later shown to two witnesses of a luncheonette robbery. *Id.* at 445, 555 *A*.2d at 584–85. The detective stated that after canvassing a neighborhood looking for leads, "he focused on the defendant as the subject of his investigation and placed his picture in the [photographic] array." *Id.* at 446, 555 *A*.2d at 585. The witnesses then both selected the defendant's photograph from the array. *Id.* at 431, 555 *A*.2d at 577. We concluded that "the inescapable inference" from the detective's testimony "was that an informant had told [the detective] that defendant committed the crime." *Id.* at 446–47, 555 *A*.2d at 585. The detective, in effect, bolstered the witness identifications by implying that a phantom witness had incriminated the defendant. *See ibid.* We noted that there was no need for the detective to justify why he placed the defendant's photograph in the array because no one had alleged arbitrary police action. *Id.* at 447, 555 *A*.2d at 585; *see also State v. Baker,* 228 *N.J.Super.* 135, 139–40, 549 *A*.2d 62, 64 (App.Div.1988) ("There is seldom any justification for admitting such evidence where the defendant does not claim that the police acted arbitrarily in approaching him."). We held that the detective's inadmissible hearsay testimony violated the principles set forth in *Bankston, supra. Irving, supra,* 114 *N.J.* at 446, 555 *A*.2d at 585.

The present case also is comparable to *State v. Tilghman,* 345 *N.J.Super.* 571, 786 *A.*2d 128 (App.Div.2001) (per curiam). In that case, a police officer testified that a robbery victim identified the photograph of the person who the officer suspected committed the robbery. *Id.* at 573, 578, 786 *A.*2d at 129, 132–33. The officer stated that once he heard the victim's description of the robber, he suspected the defendant "because he knew him." *Id.* at 578, 786 *A.*2d at 133. He offered that testimony to explain why he placed the defendant's photograph in the array. *Ibid.* The Appellate Division concluded that allowing the officer to explain why he included the defendant's picture in the array served "no legitimate need" and risked that the jury would draw the impermissible inference "that defendant had prior criminal contact with the police." *Id.* at 578–79, 786 *A.*2d at 133. In *Tilghman, supra,* the officer's testimony impermissibly bolstered the identification. *Id.* at 578, 786 *A.*2d at 133.

The common thread that runs through *Bankston, supra, Irving, supra,* and *Tilghman, supra,* is that a police officer may not imply to the jury that he possesses superior knowledge, outside the record, that incriminates the defendant. In *Bankston, supra,* and *Irving, supra,* the officers' hearsay testimony permitted the jury to draw the inescapable inference that a non-testifying declarant provided information that implicated the defendant in the crime. 63 *N.J.* at 271, 307 *A.*2d at 69; 114 *N.J.* at 445–46, 555 *A.*2d at 585. In *Tilghman, supra,* the officer's testimony that he included the defendant's photograph in the array "because he knew [the defendant]" permitted the clear inference the defendant had a criminal background. 345 *N.J.Super.* at 578–79, 786 *A.*2d at 133. *Bankston, supra,* enunciated the well-settled principle that a police officer generally may testify that he went to the scene of a crime based "upon information received," in order to show that the officer was not acting in an arbitrary manner. 63 *N.J.* at 268, 307 *A.*2d at 68. *Bankston, supra,* however, cautioned that the hearsay rule is violated if the officer states or suggests that some other person provided information that linked the defendant to the crime. *Id.* at 268–69, 307 *A.*2d at 67–68.

■ When a police officer testifies concerning an identification made by a witness, such as in this case, what counts is whether the officer fairly arranged and displayed the photographic array and whether the witness made a reliable identification. *State v. Madison*, 109 *N.J.* 223, 231–33, 536 *A*.2d 254, 258 (1988). Why the officer placed the defendant's photograph in the array is of no relevance to the identification process and is highly prejudicial. For that reason, we disapprove of a police officer testifying that he placed a defendant's picture in a photographic array "upon information received." Even such seemingly neutral language, by inference, has the capacity to sweep in inadmissible hearsay. It implies that the police officer has information suggestive of the defendant's guilt from some unknown source.

■ We, therefore, must part company from the dicta in *Irving, supra*, in which we stated that in the facts of that case "a simple statement by [the detective] that he developed the photo array 'based on information received' would have been sufficient to explain his actions." 114 *N.J.* at 447, 555 *A*.2d at 585. In contexts other than a photographic identification, the phrase "based on information received" may be used by police officers to explain their actions, but only if necessary to rebut a suggestion that they acted arbitrarily and only if the use of that phrase does not create an inference that the defendant has been implicated in a crime by some unknown person. The exception would be the defendant who opens the door by flagrantly and falsely suggesting that a police officer acted arbitrarily or with ill motive. In such a circumstance, the officer might be permitted to dispel that false impression, despite the invited prejudice the defendant would suffer.

In the present case, Gannon and O'Nieal separately selected defendant's picture from a photographic array. The jury only needed to know that the police fairly displayed the photographs to the witnesses and that the process led to a reliable identification. The detective's reasons for including defendant's photograph in the array were not relevant and were highly prejudicial. The

detective implied that he had information from an out-of-court source, known only to him, implicating defendant in the burglary. That hearsay was contrary to this State's evidentiary rules and decisional law, and violated the Federal and State Confrontation Clauses.

## C.

We now must determine whether the trial court's admission of the detective's testimony—to which there was no objection—was plain error. *R.* 2:10–2 (instructing appellate courts not to disregard an error "clearly capable of producing an unjust result"). "Because the issue is now to be resolved under the 'plain error' rule, we must consider whether there is reasonable doubt that the jury would have ruled other than as it did." *Irving, supra,* 114 *N.J.* at 447, 555 *A.*2d at 586. The State's evidence was far from overwhelming. No physical evidence linked defendant to the scene of the crime. Defendant's fingerprints were not found in the burglarized home despite the discovery of many identifiable prints in areas in which the intruder had contact. Moreover, the descriptions given by Gannon and O'Nieal of the intruder differed markedly from defendant's appearance. Both Gannon and O'Nieal believed that the intruder was clean-shaven or had very little facial hair, whereas defendant had a beard and full mustache at the time. Both considered the intruder to be shorter and younger than defendant. In fact, the composite sketch drawn by the police based on Gannon's description looked nothing like defendant. In addition, defendant presented alibi witnesses whose credibility, although vigorously challenged, was not completely undermined.

We have no mathematically precise formula for deciding whether a trial error creates a reasonable doubt that would not otherwise have existed concerning defendant's guilt. We strongly sense from the record, however, that this was a close case. The photograph of defendant with a beard and mustache taken thirteen days after the burglary did not resemble at all the composite

sketch of the clean-shaven intruder. In light of the total record, the detective's damaging hearsay testimony that defendant was a suspect in the eyes of the police "based on information received" may have tipped the scales. We cannot say that the error did not have the capacity to cause an unjust result. *R.* 2:10–2. Accordingly, we must reverse defendant's convictions.

## III.

### A.

Defendant also challenges the trial court's decision to allow Detective Calvin to testify to the out-of-court statements that John and Juliana made to him on the evening of the burglary. Defendant claims that the court erred because the seven-year-old twins' statements to Calvin did not fall into the excited utterance exception to the hearsay rule and violated his right of confrontation. Alternatively, even if those statements were excited utterances, he asks this Court to rule that their admission violated his state constitutional right to confrontation, given that the children, presumably, were available to testify. Defendant would have this Court require, as a condition to the admissibility of an excited utterance, that the declarant either testify or be unavailable to testify. The State replies that the children's statements, made shortly after the break-in to their home, were admissible as excited utterances under *N.J.R.E.* 803(c)(2). We note that only Juliana's distinctive description of the burglar to Detective Calvin is truly in issue.

Based on the plain language of *N.J.R.E.* 803(c)(2), coupled with an historical analysis of the excited utterance hearsay exception, we conclude that Juliana's statement to Detective Calvin was inadmissible hearsay and should not have been placed into evidence. Because we resolve the issue on independent state grounds, we do not need to decide the constitutional challenge, although principles derived from Confrontation Clause jurisprudence inform our analysis.

## B.

Defendant concedes that the statements made by John and Juliana to their mother and Officer Kollmar, who arrived minutes after the burglary, were excited utterances. At the time she spoke with her children, O'Nieal observed that they were "hysterical" and "very excited." The testimony of O'Nieal and Kollmar was nearly identical concerning what each had learned from the children. The children stated that the intruder entered their room, asked the location of their mother's money, touched various items, covered Juliana's mouth with his hand, warned them to be quiet, and slapped John in the face. The children darted out of the room, ran downstairs, and then John called 911. The children's accounts given to O'Nieal and Kollmar did not include a physical description of the perpetrator.

Detective Calvin did not arrive at the house until approximately ten minutes after the police received the 911 call. He first spoke with Officer Kollmar, who briefed him on what he had learned from his questioning of Gannon, O'Nieal, and the children. Calvin then proceeded to interview John and Juliana.

At a preliminary *N.J.R.E.* 104(a) hearing to determine whether the twins' statements were admissible as excited utterances, O'Nieal, the only witness called at the hearing, testified that the twins sat in her lap while Detective Calvin questioned them. Calvin asked them where they first saw the intruder, and the children responded in the form of a narrative, with the detective interjecting questions. O'Nieal could neither recall the specific questions the detective asked, nor the answers each child gave, but she did remember that the detective inquired about the intruder's appearance and attire. "[H]e was trying to get them to describe the person," O'Nieal noted, but the "children wouldn't say if he was black or white." O'Nieal stated that although her children were not particularly race-conscious, "they purposely would not use the word black," she surmised, because "Detective Calvin was black."

At trial, Detective Calvin testified to his interview of the twins:

Q: And did you have the opportunity to speak with the two children?

A: Yes, I did.

Q: And could you tell us what they told you had occurred?

A: The twins told me that they were in the bedroom basically I guess about to go to sleep when they saw a tall black male inside the bedroom. They told me that the seven-year-old girl [Juliana] said who are you and she said that the tall black male put his hands over her mouth and tell [sic] her to keep quiet. At that time John said he started screaming and the tall black male smacked him in the face and told him to keep quiet.

Q: And did either of the children describe anything else about this individual?

A: Yes, *I asked them was there anything in particular they remember about the tall black male they was [sic] referring to. Juliana told me that the suspect had a gap between his teeth and also his hands was [sic] dirty.*

[(Emphasis added.)]

The detective had elicited two critical facts that had not been mentioned earlier by the children to Officer Kollmar, Gannon or their mother,[5] that the intruder had a gap in his teeth and dirty hands, and only Juliana had made those observations. Those facts were central to the State's case because they matched defendant's appearance at the time of his arrest. Because Juliana did not testify, the jury did not learn specifically how she made her observations. For example, the jury did not learn how well the light from the hallway illuminated her darkened bedroom, whether she wore glasses, whether the intruder had a small space between his teeth or a missing tooth, how long she viewed the intruder, whether the intruder looked directly at her, or other significant details that may have touched on the reliability of her observations. The State's failure to call the children as witnesses, particularly Juliana, in view of their apparent availability, is in no way dispositive in determining whether the children's statements are excited utterances, but does factor into our analysis.

---

[5] At the preliminary 104(a) hearing, O'Nieal did mention that Juliana had told her that the intruder had "dirty hands," but she did not say whether or not Juliana told Calvin this fact, nor did she testify to this at trial.

## C.

The prosecutor offered Juliana's statement that the intruder had a gap in his teeth and dirty hands for its truth, which allowed the jury to conclude that defendant, who fit that description, and the intruder were one and the same. The State submits that Juliana's out-of-court statement was an excited utterance, a recognized exception to the hearsay rule. How we interpret that exception requires us to review the historical development of the excited utterance from its common law origins to its current formulation.

One of the central principles of the law of evidence is that all hearsay is inadmissible unless it falls within one of the many exceptions to the hearsay rule. *N.J.R.E.* 802. Hearsay is "a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." *N.J.R.E.* 801(c). An excited utterance is defined in the New Jersey Rules of Evidence as "[a] statement relating to a startling event or condition made while the declarant was under the stress of excitement caused by the event or condition and without opportunity to deliberate or fabricate." *N.J.R.E.* 803(c)(2).

The excited utterance, also commonly referred to as the spontaneous declaration, has deep roots in our common law, dating back to at least the late 17th century. *Thompson v. Trevanion, Skin.* 402, 90 *Eng. Rep.* 179 (K.B. 1694);[6] *see also* Aviva Orenstein, *"My God!": A Feminist Critique Of The Excited Utterance Exception To The Hearsay Rule*, 85 *Cal. L. Rev.* 159, 170 (1997). Long before the excited utterance took on a separate identity under our modern rules of evidence, it was grouped along with several hearsay rule exceptions (verbal act, present sense impression, and

---

[6] The first known instance of its admission comes from an English assault case, in which Lord Holt held that "what the wife said immediate upon the hurt received, and before that she had time to devise or contrive any thing for her own advantage, might be given in evidence." *Thompson, supra,* 90 *Eng. Rep.* at 179.

statement of then existing mental, emotional, or physical condition) under the umbrella of *res gestae*. *State v. Long*, 173 *N.J.* 138, 166–67, 801 *A*.2d 221, 238–39 (2002) (Stein, J., concurring in part, dissenting in part). *Res gestae* literally means " 'things done,' " and under the *res gestae* doctrine a contemporaneous statement involving events surrounding a disputed issue was admissible. *Ibid.* (quoting *Black's Law Dictionary* (7th ed. 1999)).

At common law, spontaneous declaration evidence was considered *res gestae* when a witness's statements were "so connected with an act" that the statements were deemed to be part of the overall transaction. *Hunter v. State*, 40 *N.J.L.* 495, 537 (E. & A. 1878). Stated differently, statements that were incidental to and so inherently part " 'of a particular litigated act' " and " 'not produced by the calculated policy of the actors' " were deemed *res gestae*. *Robertson v. Hackensack Trust Co.*, 1 *N.J.* 304, 313, 63 *A*.2d 515 (1949) (quoting *Hunter, supra*, 40 *N.J.L.* at 538–39). Thus, in addition to spontaneity, there were two components to admissibility of this form of *res gestae*. The words had to be spoken during the transaction and could not be the product of forethought or deliberation. *State v. Powell*, 7 *N.J.L.* 244, 248 (Sup.Ct.1824); *see also Blackman v. West Jersey & Seashore R.R. Co.*, 68 *N.J.L.* 1, 2, 52 *A.* 370, 370 (Sup.Ct.1902).

Several cases illustrate the common law formulation of the excited utterance hearsay exception. In *Blackman, supra*, a passenger, who was about to disembark from a trolley, fell off the vehicle when it suddenly accelerated. 68 *N.J.L.* at 2, 52 *A.* at 370. At trial, the injured passenger testified that after the conductor stopped the trolley and helped her up, she told him, " 'I signaled you to let me get off and you answered me.' " *Ibid.* According to the passenger, the conductor replied, " 'I know I did, but I forgot you. It is entirely my fault.' " *Ibid.* The trial court permitted the testimony on "the ground that what the conductor said was part of the *res gestae*." *Ibid.*[7]

---

[7] Today, the statement would be admissible as an admission by a party-opponent or as an admission against interest. *See Reisman v. Great American*

The *Blackman* court, however, concluded that the testimony was improperly admitted, noting that

> where the declaration is concomitant with the main fact under consideration, and is so connected with it as to illustrate its character, it may be proved as a part of the *res gestae;* but *where it is merely narrative of a past occurrence, it cannot be received as proof of the character of that occurrence.*
>
> [*Ibid.* (citations omitted)(emphasis added).]

The *Blackman* court explained that the conductor's remarks would have been admissible had they "been exclamatory, and coincident with the happening of the accident...." *Ibid.* Instead, because "the words were merely narrative of the conditions which had brought it about," they were inadmissible hearsay, despite the short time that had elapsed between the accident and the spoken words. *Ibid.*

In *State v. Doro*, a person who had witnessed the slashing of her friend's throat pursued the blood-covered killer, screaming, " 'he has just murdered somebody—catch him.' " 103 *N.J.L.* 88, 90, 134 *A.* 611, 613 (E. & A.1926). The declarant's statements were admitted under the *res gestae* rule because they were "spontaneous and unreflecting, without time for invention or misrepresentation" and part of "the necessary incidents of the litigated act." *Id.* at 93–94, 134 *A.* at 614.

On the other hand, an accident victim's statements that were the product of forethought and constituted a "narrative of a past event" were treated differently at common law. *Anastasio v. Rast,* 128 *N.J.L.* 426, 428, 26 *A.*2d 493, 494 (Sup.Ct.1942). In *Anastasio, supra,* the decedent-victim made statements to a police officer within a half hour of being injured in a motorcycle accident. *Id.* at 426, 26 *A.*2d at 493. The court ruled that the statements were not *res gestae* because they were not "made under the immediate and uncontrolled domination of the senses" and, "though the deceased was suffering intense pain, he had ample

---

*Recreation, Inc.,* 266 *N.J.Super.* 87, 97–99, 628 A.2d 801, 806–08 (App.Div.), *certif. denied,* 134 *N.J.* 560, 636 A.2d 519 (1993); *N.J.R.E.* 803(b)(4); *N.J.R.E.* 803(c)(25).

time to reflect and to make a self-serving declaration if he desired." *Id.* at 428, 26 *A*.2d at 494.

*Riley v. Weigand* is another example of a court rejecting as *res gestae* a victim's non-spontaneous post-accident narrative of the events. 18 *N.J.Super.* 66, 77, 86 *A*.2d 698 (App.Div.1952). In that case, a police officer responded to a home where the victim of a car accident had been taken. *Id.* at 70, 86 *A*.2d at 700. The officer asked the victim, who later died of his injuries, what had happened. *Ibid.* Although only a short time had passed since the accident, and despite the victim's mortal wounds, the court concluded that the victim's out-of-court statements to the police officer lacked "spontaneity," were not "concomitant with the main fact under consideration," and were "merely narrative of a past occurrence." *Id.* at 77, 86 *A*.2d at 704. Accordingly, the court ruled the statement inadmissible as *res gestae. Ibid.* The *Riley* court articulated the broad contours for the admission of the excited utterance that are followed by New Jersey courts to this day:

> Before admitting an utterance as a part of the *res gestae*, the trial judge must decide the preliminary question of whether the declarant has had any opportunity for deliberation and reflection, or whether the utterance was a spontaneous one. The matters for him to consider are the element of time, the circumstances of the accident, the mental and physical condition of the declarant, the shock produced, the nature of the utterance, whether against the interest of the declarant or not or made in response to questions or involuntary, and any other material facts in the surrounding circumstances.
>
> [*Id.* at 73–74, 86 *A*.2d at 702 (citation omitted).]

The rigorous admissibility standards for excited utterances under the common law, including early New Jersey case law, have given way in recent decades to the expansion of the excited utterance exception to the hearsay rule. *Cestero v. Ferrara,* 57 *N.J.* 497, 502, 273 *A*.2d 761, 763 (1971). In recent times, as courts have struggled to adapt the doctrine to difficult facts, "the *res gestae* concept has been considerably broadened and the requirement for strict contemporaneity has been modified." *Ibid.*

The case that heralded the expansion of the excited utterance rule dealt with the brutal rape of a sixteen-year-old deaf-mute girl

with a mental age no greater than that of a seven-year-old. *State v. Simmons,* 52 *N.J.* 538, 540–41, 247 *A.*2d 313, 314 (1968) (per curiam), *cert. denied,* 395 *U.S.* 924, 89 *S.Ct.* 1779, 23 *L.Ed.*2d 241 (1969). In *Simmons, supra,* the sexual assault victim was taken to a hospital emergency room; some time afterward, the police brought the defendant there to see if the victim could identify him. *Id.* at 541, 247 *A.*2d at 314. Still emotionally distraught, "[s]he was asked by her mother and the police officers whether the defendant was the man who had attacked her and, although she could not speak, she made identification by her actions. . . ." *Ibid.* The victim was not competent to testify at trial, and thus did not testify to her out-of-court identification. *Ibid.* Notwithstanding that the victim's statement identifying the defendant was made some time after the crime and in response to questioning, the Court ruled that the statement was a spontaneous declaration admissible under *res gestae. Id.* at 542, 247 *A.*2d at 315.

In the wake of *Simmons, supra,* courts have determined that a spontaneous declaration will be admissible, even if not "concomitant or coincident with the exciting stimulus," provided that "in the light of all the circumstances it may be said reasonably that the exciting influence had not lost its sway or had not been dissipated in the interval." *Cestero, supra,* 57 *N.J.* at 502, 273 *A.*2d at 763. We note, however, that even when this Court has applied a more expansive interpretation to the admissibility of excited utterances, the declarant always has either testified or been unavailable. *See, e.g., Verdicchio v. Ricca,* 179 *N.J.* 1, 35, 843 *A.*2d 1042, 1063–64 (2004) (admitting as excited utterance in malpractice action hysterical reaction of *testifying plaintiff* to disturbing telephone call with son's physician); *Long, supra,* 173 *N.J.* at 143, 153, 158–60, 801 *A.*2d at 224, 230, 233–35 (admitting as excited utterances statements of *murder victim* made to her mother immediately upon completion of telephone conversations with defendant); *State v. Lyle,* 73 *N.J.* 403, 411–13, 375 *A.*2d 629, 633–34 (1977) (per curiam) (admitting as excited utterance statement of *murder victim* made to sister after he was chased from his lover's home by her husband); *State v. Graham,* 59 *N.J.* 366,

369–71, 283 *A*.2d 321, 323–24 (1971) (suggesting that statements of dying *murder victim* made to police in hospital could be admissible as spontaneous declarations by trial court); *Cestero, supra,* 57 *N.J.* at 499, 502–04, 273 *A*.2d at 762, 763–65 (admitting as excited utterance statement of *testifying defendant* regarding car accident made to doctor immediately upon regaining consciousness in hospital); *Simmons, supra,* 52 *N.J.* at 541–42, 247 *A*.2d at 314–15 (admitting as spontaneous declaration gesticulation of deaf-mute rape *victim incompetent to testify* made at hospital after attack). We acknowledge that our cases have never articulated a distinction between a declarant's availability and non-availability in deciding the admissibility of an excited utterance. A more expansive approach to the admissibility of such hearsay is tempered, however, when either the declarant testifies or is unavailable. When the declarant testifies, the defendant has the opportunity to cross-examine the declarant; when the declarant is unavailable, the rule of necessity provides a justification for the admission of such evidence.

We have recognized the difficulty confronted by courts attempting to shoehorn statements of child sexual abuse victims into the excited utterance rule. In *State v. D.R.,* we recommended the creation of the tender years hearsay exception for child sex abuse cases, acknowledging the observation of the American Bar Association that courts were tending "to invoke tortured interpretations of the 'excited utterance' exception in order to sustain admissibility of a child's out-of-court statement." 109 *N.J.* 348, 361, 375–78, 537 *A*.2d 667, 674, 681–83 (1988). The American Bar Association's critique that we invoked in *D.R., supra,* laid bare a truth that courts, perhaps even unconsciously, felt pressed to distort the analysis of the excited utterance exception in order to justify the admission of evidence necessary to uphold convictions for particularly repugnant crimes.

Today, the incorporation of the tender years exception into our rules of evidence at *N.J.R.E.* 803(c)(27) allows courts to address directly a child's out-of-court statement within a clearly applicable

rule. Nevertheless, the expansive reading of *Simmons, supra,* a case involving the sexual abuse of an incompetent adolescent, continues in cases with very different factual scenarios. In those cases, with little emphasis placed on the declarant's opportunity to deliberate as a key factor in determining admissibility, out-of-court statements with detailed past narratives are introduced into evidence under cover of the excited utterance doctrine.

An examination of two civil cases, thirty years apart, both arising from car accidents, illustrates the interpretative expansion of the excited utterance rule. In both cases, a party sought to introduce through a police officer's testimony the out-of-court statements of witnesses to the accidents under the excited utterance hearsay exception. In *Sas v. Strelecki,* the plaintiffs contended that an unidentified vehicle ran their car off the road causing it to crash into a parked vehicle. 110 *N.J.Super.* 14, 16, 264 *A.2d* 247, 248 (App.Div.1970). A police officer who "arrived at the scene between five and ten minutes after receiving a radio signal" was allowed to testify to statements made at the scene of the accident by the car's driver, its passenger, and another witness. *Id.* at 17, 264 *A.2d* at 248. The Appellate Division ruled that the statements were not "spontaneous statements" and, therefore, did not fit within the hearsay exception of Evidence Rule 63(4), the predecessor to *N.J.R.E.* 803(c)(2).[8] *Id.* at 18–19, 264 *A.2d* at 248. The panel concluded that "[c]onsidering the probable lapse in time between the accident and the call to police headquarters and the detailed explanation of the accident to the officer by the occupants of the [plaintiff's] car, it is highly unlikely that the requirement of unreflective spontaneity is satisfied." *Id.* at 18, 264 *A.2d* at 249.

In *Truchan v. Sayreville Bar and Restaurant, Inc.,* a police officer responded to the scene of an accident in which the plaintiff

---

[8] *N.J.R.E.* 803(c)(2) replaced *Evid. R.* 63(4)(b) "without substantial change"; both include the phrase " 'without opportunity to deliberate or fabricate.' " *1991 Supreme Court Committee Comment* to *N.J.R.E.* 803(c)(2).

was badly injured by a drunk driver. 323 *N.J.Super.* 40, 44–46, 731 *A.*2d 1218, 1220–21 (App.Div.1999). Twenty minutes after his arrival at the scene, the officer took statements from two eyewitnesses who observed the head-on collision. *Id.* at 47–48, 731 *A.*2d at 1222. The trial court ruled that the police officer could not testify to those statements as excited utterances because the eyewitnesses had sufficient time to deliberate and confer with each other. *Id.* at 48, 731 *A.*2d at 1222. The Appellate Division reversed, concluding that as a result of the "excitement caused by the event," the witnesses "were still under the stress of the event when they related" their accounts to the officer, and neither the passage of time nor the fact that the witnesses responded to questioning rendered the hearsay inadmissible. *Id.* at 50, 731 *A.*2d at 1223 (citing *Simmons, supra,* 52 *N.J.* at 542, 247 *A.*2d at 315).

When analyzing *N.J.R.E.* 803(c)(2), *Truchan, supra,* and other similar cases have paid nominal attention to whether the declarant had the "opportunity to deliberate or fabricate" before making the statement and instead have emphasized the "startling event" to which the statement relates and the "stress of excitement" affecting the declarant. *See, e.g., State v. Conigliaro,* 356 *N.J.Super.* 54, 59–64, 69–70, 811 *A.*2d 491, 494–97 (App.Div.2002).[9] The current trend to minimize the declarant's "opportunity to deliberate" when deciding the admissibility of a proffered excited utterance is a significant break from the common law, which frowned on the introduction of past narratives through hearsay. *Riley, supra,* 18 *N.J.Super.* at 77, 86 *A.*2d at 704; *see also Anastasio,*

---

[9] In *Conigliaro, supra,* shortly after a sixteen-year-old was sexually abused by her supervisor in the bakery where she worked, she spoke with a friend and then with her mother. 356 *N.J.Super.* at 59, 811 *A.*2d at 494. The victim returned home and, three hours later, went to police headquarters where, in response to questioning from a police officer, she chronicled the events of that day. *Id.* at 60–63, 811 *A.*2d at 494–97. She then provided a written statement identical to her oral statement. *Id.* at 62, 811 *A.*2d at 496. The victim testified at the trial, and both her oral and written statements were admitted into evidence. *Ibid.* The appellate panel, relying on *Simmons, supra,* found the victim's oral statement to be an excited utterance, but not her written statement, and therefore reversed. *Conigliaro, supra,* 356 *N.J.Super.* at 63–64, 69–70, 811 *A.*2d at 496–97.

*supra,* 128 *N.J.L.* at 428, 26 *A.*2d at 494; *Blackman, supra,* 68 *N.J.L.* at 2, 52 *A.* at 370. It is the increasingly frequent use of the excited utterance exception as the vehicle for introducing past narratives from non-testifying declarants that has created tension with our common law and Confrontation Clause jurisprudence.

### D.

Given the historical background of the excited utterance, we now construe *N.J.R.E.* 803(c)(2) in light of defendant's challenge to the admission of Juliana's out-of-court description of the intruder. The essential elements of an excited utterance are 1) "[a] statement relating to a startling event or condition;" 2) "made while the declarant was under the stress of excitement caused by the event or condition;" and 3) "without opportunity to deliberate or fabricate." *N.J.R.E.* 803(c)(2).

There is no question that Juliana's statement related "to a startling event," i.e., the burglary. There is little question that Juliana was still "under stress of excitement caused by the event" fifteen to twenty minutes after the burglary when the detective questioned her while she sat on her mother's lap. But it is somewhat doubtful that the statement was made "without *opportunity* to deliberate," at least in the way those words are commonly understood. *See* 4 *Oxford English Dictionary* 413 (2nd ed. 1989) (defining deliberate to mean "[t]o use consideration with a view to decision; to think carefully; to pause or take time for consideration"). The requirement of *N.J.R.E.* 803(c)(2) that the declarant make the statement "without opportunity to deliberate" is not obsolete. In *Cestero, supra,* we stated that the stress or shock caused by the event must "still[ ] the reflective faculties ... so that the utterance which then occurs is a spontaneous and sincere response to the ... external shock." 57 *N.J.* at 502, 273 *A.*2d at 764 (quotations omitted). We noted there that "[i]t must appear that the statements were unpremeditated emanations of

the event and so connected with it as to preclude the idea that they were products of" contrivance or calculation. *Ibid.*

We thus focus our attention on whether Juliana had an opportunity to deliberate. *See Riley, supra,* 18 *N.J.Super.* at 73, 86 *A.2d* at 702 (noting that "preliminary question" is "whether the declarant has had any opportunity for deliberation and reflection"). In so doing, we look to a number of factors, including the shock effect of the burglary on Juliana, the time elapsed between that event and her statement, the continuing influence of the excitement caused by the burglary, the circumstances surrounding the taking of the statement, and whether the statement was in response to questions. *Ibid.*; *see also Long, supra,* 173 *N.J.* at 159, 801 *A.2d* at 234 (noting that "[i]n deciding whether there was an opportunity to fabricate or deliberate, a court should consider 'the element of time, the circumstances of the incident, the mental and physical condition of the declarant, and the nature of the utterance'" (quoting *State v. Williams,* 106 *N.J.Super.* 170, 172, 254 *A.2d* 538, 540 (App.Div.) (per curiam), *certif. denied,* 55 *N.J.* 78, 259 *A.2d* 228 (1969), *cert. denied,* 397 *U.S.* 1057, 90 *S.Ct.* 1405, 25 *L.Ed.2d* 675 (1970))). In assessing those factors, we consider that Juliana had spoken both to her mother and Officer Kollmar at separate times before the arrival of Detective Calvin. When Calvin questioned Juliana, she was reluctant to mention the intruder's skin color even though he specifically asked her about it. Her mother assumed that this was because Calvin himself was black. Juliana responded to questions of the detective, providing a narrative that included a description of the intruder's gap in his teeth and dirty hands.

Detective Calvin's testimony concerning Juliana's out-of-court statement was brief. We do not intimate in any way that Calvin acted improperly. Nevertheless, we do not know exactly how he framed the questions to Juliana so that he was able to ferret out information that was not spontaneously given to her mother and Officer Kollmar earlier. We do not know whether the questioning

was unintentionally suggestive, in part because the detective destroyed the contemporaneous notes he took of the interview,[10] and because the State did not call Juliana to testify, although she was apparently available. The record suggests that words were not gushing from Juliana in an excited, unreflective manner, but rather that she was thinking about her responses, i.e., deliberating. We do not imply that there is anything wrong with a witness, particularly a child, giving careful consideration to a question; in fact, it is to be encouraged. But the excited utterance exception is just that—an *exception* to the hearsay rule, and it should not be construed so broadly that it renders the hearsay rule ineffectual. In circumstances such as in this case, we should not dilute our evidentiary requirements and admit at trial an out-of-court description that does not satisfy each element of the excited utterance doctrine, particularly when the declarant is not called as a witness and is available to testify.[11]

[10] We register our displeasure that police officers engage in the seemingly routine practice of destroying their contemporaneous notes of witness interviews after the preparation of formal reports. On cross-examination, both Calvin and Kollmar admitted to defense counsel that their notes taken at the crime scene had been discarded after they wrote their reports. Calvin's report was not written until days after defendant was arrested. We expressed our disapproval of the practice of destroying contemporaneous notes in *State v. Cook,* 179 *N.J.* 533, 542 n. 3, 847 *A.*2d 530, 535 n. 2 (2004), and do so again here. *See also People v. Wallace,* 76 *N.Y.*2d 953, 563 *N.Y.S.*2d 722, 565 *N.E.*2d 471, 472 (1990) (preservation of police officers' notes is required and their loss or destruction can prejudice defendant); *People v. Martinez,* 71 *N.Y.*2d 937, 528 *N.Y.S.*2d 813, 524 *N.E.*2d 134, 135–36 (1988) (same).

[11] Juliana's out-of-court statements touched on a subject that courts have been cautioned to scrutinize carefully—identification testimony. That Juliana described physical characteristics of, rather than identified, the burglar in no way minimizes the impact of her out-of-court statement as a key piece of evidence in the State's case. We know that identification testimony in general, even when subject to cross-examination, must be carefully weighed and considered. That is so because " '[t]he vagaries of eyewitness identification are well-known; the annals of criminal law are rife with instances of mistaken identification.' " *State v. Cromedy,* 158 *N.J.* 112, 125, 727 *A.*2d 457, 464 (1999) (quoting *U.S. v. Wade,* 388 *U.S.* 218, 228, 87 *S.Ct.* 1926, 1933, 18 *L.Ed.*2d 1149, 1158 (1967)); *State in Interest of W.C.,* 85 *N.J.* 218, 224, 426 *A.*2d 50, 54 (1981).

## E.

Although we decide this case based on our interpretation of an evidentiary rule, our analysis is informed by the principles undergirding the Confrontation Clause jurisprudence of our federal and state constitutions. In that regard, we must take notice of the potential impact that the recent watershed decision in *Crawford, supra,* will have on the introduction of "testimonial" hearsay through the excited utterance exception and other hearsay exceptions. In *Crawford, supra,* the United States Supreme Court, construing the Sixth Amendment's Confrontation Clause, held that "testimonial" hearsay cannot be introduced into evidence unless there is a showing that the declarant is unavailable and that the defendant had a previous opportunity to cross-examine the declarant. 124 *S.Ct.* at 1374. The Court declined to "spell out a comprehensive definition of 'testimonial,'" but stated that "it applies at a minimum to prior testimony at a preliminary hearing, before a grand jury, or at a former trial; and to *police interrogations." Ibid.* (emphasis added).

In *Crawford, supra,* the prosecution introduced into evidence a wife's statement to police detectives implicating her husband in a murder. 124 *S.Ct.* at 1356–57. The hearsay statement—the product of police interrogation—was admitted as a declaration against the wife's penal interest, in accordance with Washington's evidentiary rules. *Id.* at 1358. The wife, who was a suspect herself at the time she gave the statement, did not testify at her husband's trial because of the marital privilege. *Id.* at 1357–58, 1372. The Supreme Court concluded that the introduction of the wife's testimonial statement to the police violated the defendant's constitutional right to confrontation because he had no opportunity to cross-examine her. *Id.* at 1374.

In so doing, the Court overruled, at least in part, *Ohio v. Roberts,* 448 *U.S.* 56, 100 *S.Ct.* 2531, 65 *L.Ed.*2d 597 (1980), which "conditions the admissibility of all hearsay evidence on whether it falls under a 'firmly rooted hearsay exception' or bears 'particularized guarantees of trustworthiness.'" *Crawford, supra,* 124 *S.Ct.*

at 1369 (quoting *Roberts, supra*, 448 *U.S.* at 66, 100 *S.Ct.* at 2539, 65 *L.Ed.*2d at 608). The *Crawford* Court rejected "[t]he *Roberts* test [that] allows a jury to hear evidence, untested by the adversary process, based on a mere judicial determination of reliability," and concluded that "[w]here testimonial statements are at issue, the only indicium of reliability sufficient to satisfy constitutional demands is the one the Constitution actually prescribes: confrontation." 124 *S.Ct.* at 1370, 1374.

The Court specifically cited *White v. Illinois*, 502 *U.S.* 346, 112 *S.Ct.* 736, 116 *L. Ed.*2d 848 (1992), a case involving "statements of a child victim to an investigating police officer admitted as spontaneous declarations" as "arguably in tension" with its decision in *Crawford, supra.* 124 *S.Ct.* at 1368 n. 8. In *White, supra,* the Court held that the Federal Confrontation Clause did not require a declarant's unavailability as a condition for the admissibility of an out-of-court statement that fits into the excited utterance exception to a state's hearsay rule. *Crawford, supra,* 124 *S.Ct.* at 1368 n. 8. The *Crawford* Court noted that "the only question presented in *White* was whether the Confrontation Clause imposed an unavailability requirement on the types of hearsay at issue" and that *White*'s "holding did not address the question whether certain of the statements, because they were testimonial, had to be excluded *even if* the witness was unavailable." *Ibid.* In limiting *White, supra,* to the narrow question that it addressed, the *Crawford* Court expounded that "to the extent the hearsay exception for spontaneous declarations existed at all [at the time of the adoption of the Bill of Rights], it required that the statements be made 'immediat[ely] upon the hurt received, and before [the declarant] had time to devise or contrive any thing for her own advantage.'" *Ibid.* (quoting *Thompson, supra,* 90 *Eng. Rep.* at 179). Consequently, *White*'s holding that the Confrontation Clause does not impose a requirement of a declarant's unavailability for the introduction of an excited utterance is very much in doubt with regard to out-of-court statements that are the product of police interrogation. *Crawford, supra,* is a reminder that even firmly established

exceptions to the hearsay rule must bow to the right of confrontation.

## F.

We do not have to decide whether Detective Calvin's questioning of Juliana was "police interrogation" or whether her statement was "testimonial" in the manner understood in *Crawford, supra*,[12] because we can resolve this case on state evidentiary grounds. *State v. Guenther*, 181 *N.J.* 129, 150–51, 854 *A.*2d 308, 320–21 (2004); *see also In re New Jersey Am. Water Co.*, 169 *N.J.* 181, 197, 777 *A.*2d 46, 55 (2001) (noting that " 'courts should not reach constitutional questions unless necessary to the disposition of the litigation' " (quoting *O'Keefe v. Passaic Valley Water Comm'n*, 132 *N.J.* 234, 240, 624 *A.*2d 578, 581 (1993))). We hold that Juliana's statement in response to Calvin's questioning was not an excited utterance. For the reasons discussed earlier, we conclude that she had the opportunity to deliberate before making the statement. We also caution courts not to give too broad a reading to the excited utterance exception when a declarant is available and does not testify. By taking such an approach we pay proper respect to the principles animating our Confrontation Clause jurisprudence and the limitations the common law placed on the excited utterance exception.

The Confrontation Clause and hearsay rules "protect similar values," *Green, supra*, 399 *U.S.* at 155, 90 *S.Ct.* at 1933, 26 *L.Ed.*2d at 495, and "stem from the same roots," *Dutton v. Evans*, 400 *U.S.* 74, 86, 91 *S.Ct.* 210, 218, 27 *L.Ed.*2d 213, 225 (1970). We must not minimize the importance of the role that cross-examination plays in the ascertainment of truth in our criminal justice system. By this opinion, we intend to place sensible limits on, not eliminate, the contemporary interpretation of the excited utterance exception to the hearsay rule. Courts must be mindful, as well, of the

---

[12] *Crawford, supra,* was decided after both parties had submitted their briefs for this case.

requirements placed by *Crawford, supra,* on the admission of testimonial evidence, whether in the context of the excited utterance exception or any other exception to the hearsay rule.

Defendant requests that we construe our State Constitution's Confrontation Clause to require either that the declarant testify or that the declarant be unavailable as a condition to the admissibility of an excited utterance. We decline to do so, even though several states have interpreted their state constitutions to require the declarant's testimony or unavailability as a condition of admissibility. *E.g., State v. McGriff,* 76 *Hawai'i* 148, 871 *P*.2d 782, 790 (1994) (holding that "under the confrontation clause of the Hawai'i Constitution, a showing of the declarant's unavailability is necessary to promote the integrity of the fact finding process and to ensure fairness to defendants" (quotations omitted)); *State v. Lopez,* 122 *N.M.* 459, 926 *P*.2d 784, 789 (Ct.App.) (holding that "when a hearsay declarant is not present for cross-examination at trial, the confrontation clause of the New Mexico Constitution requires a showing that he or she is unavailable"), *cert. denied,* 122 *N.M.* 279, 923 *P*.2d 1164 (1996); *State v. Moore,* 334 *Or.* 328, 49 *P*.3d 785, 792 (2002) (holding that "[b]efore the state may introduce into evidence a witness's out-of-court declarations against a criminal defendant, the state must produce the witness at trial or demonstrate that the witness is unavailable to testify").[13] We do

---

[13] The Oregon Constitution's Confrontation Clause is worded differently from the analogue provision in the Federal and New Jersey Constitutions. *Compare Or. Const.* art. I § 11 ("In all criminal prosecutions, the accused shall have the right … to meet the witnesses face to face ….") *with U.S. Const.* amend. VI ("In all criminal prosecutions, the accused shall enjoy the right … to be confronted with the witnesses against him ….") *and N.J. Const.* art. 1, ¶ 10 ("In all criminal prosecutions the accused shall have the right … to be confronted with the witnesses against him…."). However, the Hawaii and New Mexico Constitutions' Confrontation Clauses are worded almost identically to our Confrontation Clause. *Haw. Const.* art. 1, § 14 ("In all criminal prosecutions, the accused shall enjoy the right … to be confronted with the witnesses against the accused…."); *N.M. Const.* art. 2, § 14 ("In all criminal prosecutions, the accused shall have the right … to be confronted with the witnesses against him….").

believe, however, that the issue deserves careful study and, therefore, we submit the matter to the Supreme Court Committee on the Rules of Evidence to consider whether a rule change would be advisable.[14]

Finally, we need not determine whether the erroneous admission of Juliana's statement constituted reversible error in light of our earlier decision to grant a new trial.

## IV.

In conclusion, we hold that the trial court erred in permitting Detective Calvin to testify that he placed defendant's picture in the photographic array because he had developed defendant as a suspect from unknown sources and in permitting the detective to testify concerning Juliana's non-spontaneous description of the burglar. Accordingly, we reverse the judgment of the Appellate Division and remand for a new trial consistent with this opinion.

Justice LONG did not participate.

*For reversal and remandment*—Chief Justice PORITZ and Justices LaVECCHIA, ZAZZALI, ALBIN, WALLACE and RIVERA–SOTO—6.

*Opposed*—None.

---

[14] The guidelines for the adoption of a new evidence rule are set forth in *N.J.S.A.* 2A:84A–33 to –44 of the Evidence Act. *D.R., supra,* 109 *N.J.* at 374–75, 537 *A.*2d at 681.