**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-0427-16T1

STATE OF NEW JERSEY,

      Plaintiff-Respondent,

v.

JOSE MEDINA,

      Defendant-Appellant.

_____

Submitted March 21, 2018 – Decided  September 14, 2018

Before Judges Fuentes, Koblitz and Suter.

On appeal from Superior Court of New Jersey, Law Division, Essex County, Indictment No. 14-09-2344.

Robert Carter Pierce, attorney for appellant.

Robert D. Laurino, Acting Essex County Prosecutor, attorney for respondent (Tiffany M. Russo, Special Deputy Attorney General/Acting Assistant Prosecutor, of counsel and on the brief).

    The opinion of the court was delivered by

FUENTES, P.J.A.D.

Defendant Jose Medina allegedly confronted Anthony Rivera outside of a bar in the Township of Belleville and slashed his face with a box cutter while saying the words: "you remember me."  Defendant was tried before a jury and convicted of second degree aggravated assault, N.J.S.A. 2C:12-1b(1), fourth degree unlawful possession of a weapon, N.J.S.A. 2C:39-5d third degree possession of a weapon for an unlawful purpose, N.J.S.A. 2C:39-4d, and third degree aggravated assault, N.J.S.A. 2C:12-1b(2).  The court sentenced defendant to an aggregate term of seven years imprisonment, with an eighty-five percent period of parole ineligibility and three years parole supervision, as mandated by the No Early Release Act, N.J.S.A. 2C:43-7.2.

In this appeal, defendant argues the trial court committed three principal legal errors that permitted the State to rely on incompetent evidence, undermined the impartiality of the jury, and violated his right to a fair trial.  The first argument concerns the investigative methods used by the police to identify him as the person who committed these crimes.  Rivera was unable to identify his attacker at the time of the assault.  The only person who identified defendant as the attacker was a woman who was present at the altercation, but refused to provide her name to the police officers who responded to the scene of the assault.  This unidentified alleged eyewitness provided the police officers defendant's name and Instagram account.

According to defendant, the trial court erred when it admitted the hearsay testimony of the detective who prepared the photo-array that included defendant's photograph. The detective testified that he prepared the photo-array from information he received from the police officers who interviewed this unidentified individual at the scene of the attack. Although the detective did not reveal the content of the statements provided by the alleged eyewitness, defendant argues the reference to this witness implied that she had knowledge of defendant's guilt.

Defendant also argues the trial court erred when it admitted a video recording of a barroom brawl that occurred before this incident. The video allegedly shows defendant and Rivera as active participants in the melee. The trial judge denied defendant's pretrial motion to exclude the video, and admitted it for identification purposes pursuant to N.J.R.E. 803(a)(3) because it established defendant's identity and motive to attack Rivera. Finally, defendant claims that in the course of his direct examination of Rivera, the prosecutor persistently questioned Rivera regarding his uneasiness at trial, until Rivera admitted he feared retaliation from defendant. Defendant contends this was highly prejudicial testimony that had the capacity to inflame the jury's passions and improperly influence the jury's verdict. Defendant also argues the trial judge erred when he overruled defense counsel's timely objections to this line of questioning by the prosecutor.

A-0427-16T1

After reviewing the record developed before the trial court and being mindful of prevailing legal standards, we reverse. We conclude the trial judge committed reversible error when he allowed the State to rely on unverifiable hearsay testimony to create the photo-array used by Rivera to identify defendant as his attacker. This error irreparably tainted the reliability of the jury's verdict and violated defendant's right to a fair trial. Based on the magnitude of this error, we need not decide defendant's remaining arguments.

I

The Incident

According to the State, the genesis of the incident that resulted in the prosecution of defendant in this case occurred on November 14, 2013, more than a month before the night of the attack. On this earlier encounter, defendant and Rivera were both patronizing a bar called Yesterday's Bar (Yesterday's), located in the City of Clifton. The two men did not know each other. Defendant was accompanied by his two friends Kasseem Harris and John Ventura. According to Ventura, he saw "a fight [break] out between my friends and another group of people." Unbeknownst to any of the participants, an unidentified individual recorded the fight and posted the video on the website, YouTube. The State moved the video recording into evidence after Ventura confirmed it was "an accurate depiction of what [he] recall[ed] happening that night."

A-0427-16T1

Although both defendant and Rivera were involved in the fight, Ventura only identified defendant in the video as "the person in the white T-shirt." In the course of cross-examination, Ventura testified that Rivera told him that he hit defendant over the head with a bottle. However, when defense counsel asked Ventura: "So, the injury to Mr. Medina's head was caused by Anthony [Rivera] hitting him with a bottle. Is that correct?" Ventura answered: "As far as I know." Clifton Police Detective Richard Dibello was one of the police officers who responded to a report of a "large-scale fight" at Yesterday's. Dibello testified that after he arrived, he spoke to and took statements regarding the incident from defendant, Ventura, Brant Rider and Peter Castro.[1] According to Detective Dibello, defendant told him that he was struck over the head with a bottle but could not identify the person who struck him.

The incident that gave rise to this case occurred on the evening of December 27, 2013. On that night, Rivera and several of his friends, including Tommy Rafferty, were at a bar called Speakeasy's located in the Township of Belleville. At one point, Rivera decided to go outside with Rafferty to smoke a cigarette. Rivera provided the following testimony as to what occurred next:

> When I was walking outside, my friend was walking behind me. I opened the door. Somebody cut - - cut me off to go outside. When he cut off, two girls are walking inside. I held the . . . door for the two girls and then as

---

[1] "Brant Rider" and "Peter Castro" are spelled phonetically in the trial record.

A-0427-16T1

soon as I walked outside, I was getting smacked in my face.

Q. Okay. Now, backing up, did you see - - strike that. Did you see who struck you in the - - who smacked you in the face?

A. Yes, when we was outside.

Q. And when was the first instant that you noticed that person?

A. Ah, well, I - - I noticed him - - I saw him inside but I didn't see his whole face inside the bar. But I saw his - - I knew who - - I knew who he was after I got smacked and we made eye contact.

Q. How was he - - if you recall - - how was he dressed?

A. Ah, he had jeans on and with ah, just a hoodie.

. . . .

Q. Okay. At some . . . point, did he put it on? Or was it always on?

A. No. He put it on while he was walking outside.

Q. . . . When you got smacked, did you know what happened at first?

A. Ah, no, I didn't.

. . . .

I thought I just got smacked and then I - - I just looked until somebody told me that he sliced me.

. . . .

A-0427-16T1

Q.  And, now, when you - - when you looked over at the person who sliced - - who smacked you at that point, and you later heard from someone out there that you were sliced, as you just indicated, did you immediately recognize the person?

A.  Ah, not immediately?  Ah, but it was just in my head that I did see him somewhere?  But not immediately.

At the prosecutor's behest, Rivera made an in courtroom identification of defendant as the man who "sliced" him that night.  Rivera also testified that the attacker said: "Do you remember me."  Belleville Detective Andrew Depeczek responded to the scene and questioned Rivera regarding the incident.  When asked to describe Rivera's appearance at the time, Depeczek testified: "He was in a lot of pain.  Umm he was holding his face.  Appeared to be in shock."  Rivera told Depeczek that he was slashed in the face by a "Hispanic male wearing a gray sweatshirt," who was approximately thirty years old.  However, Rivera told Depeczek that "he did not know the person, no."  In fact, Depeczek wrote in his report: "that the victim stated it was an unknown male."  When asked to explain if this particular phrase has a special meaning to law enforcement investigators, Depeczek testified: "[it means] that the person doesn't have specific knowledge of the person."  However, according to Depeczek, Rivera told him that he could identify his attacker if he saw him again.

A-0427-16T1

Identity of the Attacker

Belleville Detective Anthony Abate was also part of the investigation team that responded to the scene of the incident. Abate received information from police officers who spoke to Rafferty about an unidentified woman who may have had relevant information. Abate testified that the police officers "spoke to one female who didn't want to get involved" in the case.[2] Abate retrieved the surveillance video recording from Speakeasy's that captured the incident. He also interviewed Rivera at the Belleville Police Station.

The appellate record includes a letter-brief and appendix submitted to the trial court by defendant's trial counsel "in opposition to the State's motion in limine," which sought, inter alia, "permission for the police officer to use the term 'based on information received' to explain why Mr. Medinas' photograph was included in the photo array presented to the victim." Defendant's trial counsel included in the appendix a copy of a Belleville Police Department Report authored by Detective Abate on December 28, 2013. In this report, Abate included the following account of how the police discovered the identity of the alleged attacker:

> While Officers were on scene, Lt. Castellano was approached by a female who wished to remain anonymous and advised him that she knew who the suspect that cut Mr. Rivera was. [sic] She provided Lt. Castellano with a

---

[2] The trial judge overruled defense counsel's objections to this line of questions by the prosecutor.

picture of a Hispanic male on Instagram with the screen name of louminatti and stated that his real name was Jose Medina.

In anticipation of Detective Abate's testimony concerning the photo-array, the trial judge conducted a sidebar conference to caution the prosecutor that Detective Abate "can't speak as to what information [the unidentified woman] gave him, it's hearsay." Defense counsel noted that since Abate would be relaying what the officers told him about what the unidentified woman told them, his testimony would actually constitute "double hearsay." The prosecutor agreed to phrase his questions in a manner that would avoid the introduction of hearsay testimony. Abate testified that Rivera described the attacker as a "<u>Hispanic male, stocky build, wearing a gray hooded sweatshirt and gray sweatpants</u>." [(Emphasis added).] Rivera also told him that he could identify "the person who did this to him if he saw him again."

Abate testified that based only on Rivera's description, he suspected that the attacker was defendant Jose Medina and "generated a photo lineup." At the prosecutor's request, Abate provided the following description of a photo line-up to the jury:

> It's a group of six photographs that's put together, one being of the suspect and the five others being of individuals, you know, fillers.
>
> Q. And the fillers, how are they chosen?

A-0427-16T1

A. - - I choose individuals that appear - - ah, that look similar to the suspect.

Rafferty, the person who was standing next to Rivera at the time of the attack, did not testify at trial. Abate's trial testimony that described what allegedly led him to suspect defendant was the attacker, and to include his photograph in the photo-array was misleading and incomplete because it did not include the information the police received from the unidentified woman. Despite the trial judge's previous acknowledgement that any testimony concerning the information the police received from the unidentified woman was inadmissible hearsay evidence, the prosecutor asked Abate the following questions:

Q. Detective, after speaking with the officers who had done the crime scene, did they tell you that they had spoken with some witnesses?

A. Yes.

Q. Including one - -

DEFENSE COUNSEL: Judge, at this point - - this is like double hearsay.

THE COURT: He's just [going to] say whether he talked to them, not what they said but whether he talked to them.

Q. I'm not asking what they said but they spoke, <u>for example, with one female who didn't want to get involved</u> - -

THE COURT: Overruled, go ahead.

A-0427-16T1

Q. They spoke with one female who didn't want to get involved, correct?

A. Correct.

Q, Don't tell me what they said.

A. Correct.

Q. Okay. They spoke with another individual by the name of Tom Rafferty, correct?

A. Correct.

Q. And they intended to speak with other people, as well, to no avail. Correct?

A. Correct.

Q. Now, when - - were any witnesses - - or specifically, of the witnesses - - Mr. Rafferty was the only one who was willing to come in and give a statement, correct?

A. Correct.

Q. Did you take a statement from him?

A. Yes.

[(Emphasis added).]

The prosecutor revisited this line of questions in his redirect examination of Detective Abate:

Q. Now, you testified earlier that you also spoke with - - or, not you, but officers at the scene did manage - - and don't tell me what anyone said at the scene - - but they managed to speak with one person, a female, who wished

11

to remain anonymous, didn't want to give a statement. Correct?

A. Correct.

## Prejudicial Testimony

The second issue defendant raised in this appeal concerns a series of questions the prosecutor asked during his redirect examination of Rivera. In the course of cross-examination, defense counsel asked Rivera a series of questions concerning a civil suit Rivera filed in connection with the injuries he sustained in this attack. In this civil action, Rivera named as defendants a number of individuals, including the bar Speakeasy and defendant Jose Medina. Rivera confirmed that in the civil complaint he asserted that the bar "assisted Mr. Medina by secreting the weapon that was brought into the bar." Rivera also acknowledged that he reached "a settlement" in this civil action.

In the course of his redirect examination, the prosecutor asked Rivera the following questions:

Q. So - - are you nervous right now?
How do you feel right now?

A. Ah, a little nervous.

Q. How about when you testified at the Grand Jury? How would you describe how you felt?

A. Ah, I was - - I was nervous, too.

A-0427-16T1

Q. So, why are you nervous right now?

A. Ah, I - - just sitting here and just thinking about like what - - just always thinking about what's going on, my face getting sliced, everything just coming back to me.

Q. What about at the Grand Jury? Why were you nervous then?

A. Ah, just the same thing. Just always - - this just bringing me back memories of the day I'm getting sliced and just picturing, remembering everything.

. . . .

Q. Anything else about what's happening here that's making you nervous?

A. Ah, yes.

Q. What?

A. Ah, I don't know, whatever could happen after court or anything - -

DEFENSE COUNSEL: Objection. Judge, can I have a sidebar.

[The following colloquy took place at sidebar.]

DEFENSE COUNSEL: The jury's [going to] interpret that as he's [going to] be threatened and we're getting . . . into an area here which is very dangerous because, at this point, if he says anything further I'm [going to] move for a mistrial.

PROSECUTOR: There's nothing else he [is going to] elicit, aside from the fact that - -

13

THE COURT: All right.  Let's deal with what we have in front of us.  First of all, the answer was inappropriate and it tends to convey to the jury that he's afraid of some physical or repercussion as a result of his testimony here.  As a result of that, I'm [going to] . . . on proper application, I will strike it from the jury.

DEFENSE COUNSEL: I will ask that, Judge.

PROSECUTOR: I have no objection to that . . . I want for the record to be clear my reason for going into that, asking him if he's nervous or what he's feeling is because [defense counsel] went into the alcohol use, the drug use, pain killers, and I don't want them to think that he's . . . referring to them, implying that he's somehow out of it.

THE COURT:  It's nobody fault that, at times, witnesses blurt out something they shouldn't blurt out.  I'm trying to correct the record.

At the conclusion of this sidebar conference, the judge addressed the jury as follows:

The question posed by [the prosecutor] was a very legitimate question: What else is making you nervous here today.  All right?  The answer provided by Mr. Rivera was not appropriate.  And I hesitate to bring it to your attention but I'm going to.   [The judge directs the court reporter to read back the last part of the witness's testimony.]  That statement, itself, I'm striking from the record.  You're not to consider it when I say this to you, here's what I'm saying to you.  I direct that you do not use this stricken testimony in your deliberations, I am not asking you to forget it, because that's beyond the mental abilities of most human beings.  To the contrary, I'm asking you to remember what was stricken and understand that the information is necessary to your decision, you may not use it.  It's stricken.

14

As we noted earlier, the prosecutor filed an in limine motion to obtain a number of pre-trial rulings concerning the admissibility of certain evidence. As part of this motion, the prosecutor sought leave to admit the video recording of the barroom brawl at Yesterday's, an event that occurred more than a month before the incident at Speakeasy's in Belleville. The prosecutor argued the video recording was admissible under N.J.R.E. 404(b) for the sole purpose of establishing defendant's identity and motive to assault Rivera. Defendant filed a cross-motion, supported by a letter-brief seeking to exclude the video pursuant to the standard established by the Court in State v. Cofield, 127 N.J. 328 (1992). Defendant argued the State cannot prove, by clear and convincing evidence, that defendant was one of the people involved in the barroom brawl at Yesterday's, or that he was in the bar at 2:45 a.m. on November 14, 2013, the time and date of the video recording.

The judge conducted an N.J.R.E. 104(a) hearing at which the State presented the testimony of three witnesses, Belleville Detective Richard Dibello, John Ventura, and Rivera. Defendant called Raoul Perez, who testified he was at Yesterday's Bar with defendant and two women companions at the time of the brawl. After considering the testimonial evidence and the arguments of counsel, the judge ruled that "the proffered evidence is inadmissible under [N.J.R.E.] 404(b) but yet is admissible predicated upon [N.J.R.E.] 803(a) . . . [as a] prior identification of a

person as analyzed in State v. Henderson, 208 N.J. 208, 261 (2011)." The judge

gave the following explanation for his ruling:

> Under an appropriate scenario, prior assaultive behavior would be admissible under Cofield . . . 127 N.J. 328 (1992), and under the analysis discussed above. The perplexing problem is the facts as developed during the Rule 104 hearing, do not establish that Medina committed a "prior bad act" against Rivera. It is certainly true that both parties ostensibly fought with the other in their group, but not against each other. Thus, the threshold requirement for admissibility, a prior bad act, has not been demonstrated.
>
> Having rejected the [N.J.R.E.] 404(b) avenue of admissibility, the [c]ourt is persuaded that the prior contact . . . is properly and necessarily introduced under the identification principles delineated in State v. Henderson, . . . and [N.J.R.E.] 803(a).

On the second day of trial, defense counsel again expressed his concern about

allowing the jury to see the video of the fight at Yesterday's. Defense counsel argued

the video was highly prejudicial and any information regarding the video could be

elicited through testimony from witnesses. Counsel explained the basis for his

concern about the video as follows:

> There are parts in there where my client is lifting a chair, where my client is holding bottles - - granted, he didn't hit anybody with the bottle, and he didn't hit anybody with a chair in the video. However, I think the prejudicial impact of that is so . . . horrific that there's no way that I'm [going to] be - - a charge will sanitize the jurors' minds from being able to separate that.

16

> The goal of the prosecutor is to show motive, which is [going to] come out through testimony. And the fight is clearly in progress . . . the victim is not even depicted on the video, so the video has no relevance with regard to . . . [the] victim. It has no relevance with regard to that. It only shows him [presumably defendant] at a fight. The victim was sequestered at a location where he couldn't see what was happening. So, the video does not help with regard to what happened to . . . the State's victim, it doesn't.

In response, the prosecutor conceded that the video "absolutely go[es] to motive . . . there is no question about that." The prosecutor also argued the video related to the identification of defendant as one of the combatants in the bar brawl. The judge rejected defense counsel's arguments, and reaffirmed that he did not admit the video under N.J.R.E. 404(b) because the State could not satisfy the "clear and convincing" burden of proof. Although the judge characterized the video as "too freakin' chaotic," he nevertheless allowed the jury to see it because it shows defendant's presence in the bar. The judge told counsel that he would instruct the jury that "no matter what happened . . . [in] that bar in Clifton, it's of no moment for you. All you have to determine is if somebody was there - - and <u>it goes to the issue of identity and motive</u> and nothing else." [(Emphasis added).]

At the request of defense counsel, the judge asked the prosecutor to replay the video outside the presence of the jury. Thereafter, the prosecutor agreed not to play to the jury a section of the video that shows defendant "picking up two bottles[.]" Despite the clear and repeated statements indicating that he was admitting the video

to establish both identity and motive, the judge told defense counsel: "I want to emphasize for the record, it's not a [N.J.R.E.] 404(b) situation because nobody can demonstrate there was any wrongful act committed against either one of them. The only purpose of it is it placed [defendant and Rivera] that night [in Yesterday's] and that would aid in the identification."

The prosecutor played the video during Ventura's testimony. Ventura testified the video accurately depicted the events that transpired that night in Yesterday's and identified defendant in the video. When the prosecutor moved to admit the video into evidence, the judge gave the jury the following instructions:

> Ladies and gentlemen, let me explain it to you again, I mentioned it the other day. I'm [going to] mention it again. There is a contention that [Rivera], the alleged victim, in this case, and [defendant], the accused in this case, were at that location on that particular night.
>
> Now, what is important is whether or not they saw each other there. All right? The only purpose of this evidence is to address the question of identity - - whether [defendant] was the person who allegedly assaulted [Rivera] six weeks later on in Belleville. All right? That's the only purpose. So, the limited purpose of this video is not to decide who's right or who's wrong on that video. That's irrelevant.
>
> The purpose of that video is to determine two things, actually: The identity, and maybe some motive that was involved here. All right? That's the limited purpose of it and only - - only that limited purpose. All right? So I don't want you to make a bigger deal out of it than it is, but that's the purpose of why it's being admitted.

18

[(Emphasis added).]

Defendant did not testify in his own defense.  Defense counsel called only one witness, Clifton Police Detective Richard Dibello.  He was one of the police officers who responded to a report of a "large-scale fight" at Yesterday's Bar on the early morning hours of November 14, 2013.  Dibello testified that Medina "was unable to determine who struck him with a bottle."

## II

Against this record, defendant appeals raising the following arguments.

> POINT I
>
> THE TRIAL COURT ERRED BY PERMITTING THE STATE TO INTRODUCE IN EVIDENCE A VIDEO OF A PRIOR BARROOM BRAWL, WHICH DEPICTS MR. MEDINA AS A COMBATANT, AS A PRIOR IDENTIFICATION PURSUANT TO N.J.R.E. 803(a)(3).
>
> POINT II
>
> THE TRIAL COURT ERRED BY RULING THAT THE VIDEOTAPE WAS NOT UNDULY PREJUDICIAL.
>
> POINT III
>
> THE TRIAL COURT ERRED BY RULING THE VIDEOTAPE ADMISSIBLE BECAUSE THE VIDEOTAPE DOES NOT DEPICT RIVERA BEING IN A FIGHT WITH MR. MEDINA AND THE VIDEO CANNOT BE AUTHENTICATED.

A-0427-16T1

POINT IV

THE TRIAL COURT ERRED BY PERMITTING DETECTIVE ABATE TO TESTIFY THAT ANOTHER OFFICER TOOK A STATEMENT FROM AN ANONYMOUS FEMALE AND FURTHER ERRED BY PERMITTIMG THE STATE TO [SIC] USE OF THE TERM, "BASED UPON THE EVIDENCE COLLECTED," TO EXPLAIN THE REASON WHY MR. MEDINA'S PHOTO WAS INCLUDED IN A PHOTO ARRAY. THESE ERRORS DEPRIVED MR. MEDINA OF HIS SIXTH AMENDMENT RIGHT TO CONFRONTATION. (Raised below in a motion in limine and at trial as a hearsay objection. The trial court's decision granting the State permission to use the term is not of record.)

POINT V

THE TRIAL COURT ERRED BY OVERRULING DEFENDANT'S OBJECTION TO THE PROSECUTOR'S QUESTION TO THE VICTIM DESIGNED TO ELICIT TESTIMONY THAT THE VICTIM WAS AFRAID OF WHAT THE DEFENDANT WILL DO TO THE VICTIM AFTER THE TRIAL.

We start our analysis by reaffirming a rudimentary principle of our State's system of criminal justice. Although a defendant is not entitled to a perfect trial, he or she is entitled to a fair one. State v. Swint, 328 N.J. Super. 236, 261 (App. Div. 2000), citing State v. Feaster, 156 N.J. 1, 84 (1998). This means a jury's verdict must be supported by competent evidence in the record that establishes a defendant's guilt beyond a reasonable doubt. Here, the misapplication of the rules of evidence permitted the introduction of materially incompetent evidence that irreparably

20                                                    A-0427-16T1

tainted the reliability of the jury's verdict. The first serious error occurred when the investigating officer relied on unverifiable hearsay statements from an unidentified woman to create the photo-array.

The Confrontation Clause of the Sixth Amendment allows the accused the right "to be confronted with the witnesses against him." U.S. Const. amend. VI. The Confrontation Clause's goal of ensuring the reliability of evidence against a defendant is "ordinarily achieved by the opportunity to cross-examine witnesses effectively, which is an 'essential and fundamental requirement' of a fair trial." State ex rel. A.R., 447 N.J. Super. 485, 506-7 (App. Div. 2016) (quoting Pointer v. Texas, 380 U.S. 400, 405 (1965)); see also State v. Castagna, 187 N.J. 293, 309 (2006). These Constitutional protections prohibit the use of testimonial statements from a non-testifying declarant at trial, unless "the [declarant] appears for cross-examination at trial[.]" Crawford v. Washington, 541 U.S. 36, 59 n.9 (2004).

Our Supreme Court has proclaimed that "[w]hen the logical implication to be drawn from . . . testimony leads the jury to believe that a non-testifying witness has given the police evidence of the accused's guilt, the testimony should be disallowed as hearsay." State v. Bankston, 63 N.J. 263, 271 (1973). In Bankston, the Court made "clear that both the Confrontation Clause and the hearsay rule are violated when, at trial, a police officer conveys, directly or by inference, information from a non-testifying declarant to incriminate the defendant in the crime charged." State v.

Branch, 182 N.J. 338, 350 (2005) (citing Bankston, 63 N.J. at 268-69). "[A] police officer may not imply to the jury that he possesses superior knowledge, outside the record, that incriminates the defendant." Branch, 182 N.J. at 351. Thus, a police officer is prohibited from suggesting that an anonymous individual provided information that linked the defendant to the crime. Ibid. (citing Bankston, 63 N.J. at 268-69).

The courts in this State have consistently applied this principle to facts remarkably similar to those we confront here. In Branch, a police officer testified that he placed the defendant's picture in a photo-array "based on information received." Branch, 182 N.J. at 347. The Court noted that there was "no trial testimony or evidence, other than those identifications, that could have led [the police officer] to focus on defendant as a suspect." Id. at 347. Under these circumstances, the Court concluded:

> [T]he jury was left to speculate that the detective had superior knowledge through hearsay information implicating defendant in the crime. Because the nameless person who provided the "information" to Calvin was not called as a witness, the jury never learned the basis of that person's knowledge regarding defendant's guilt, whether he was a credible source, or whether he had a peculiar interest in the case. Defendant never had the opportunity to confront that anonymous witness and test his credibility in the crucible of cross-examination.
>
> [Id. at 347-348.]

In State v. Irving, 114 N.J. 427, 445 (1989), a police officer similarly testified that "based on the information . . . [he] received," he created a photo-array containing the defendant's photograph. The Court held that although the testimony constituted hearsay under Bankston, it did not reach the level of plain error. Irving, 114 N.J. at 446. The Court began by stating the basic principles derived from Bankston: "[The 'upon information received' testimony] is admissible to show that the officer was not acting arbitrarily . . . [but] when an officer becomes more specific by repeating what some other person told him concerning a crime by the accused, the hearsay rule is violated." Ibid. (citing Bankston, 63 N.J. at 268) (internal citations omitted). The Court stated that a "simple statement" by the police officer that he created "the photo array 'based on information received' would have been sufficient to explain his actions." Id. at 447. Defense counsel in Irving did not timely object to the police officer's testimony and therefore the issue had to be resolved under the "plain error" rule. Ibid. There was other substantial credible evidence that incriminated the defendant, and therefore the Court concluded the hearsay did not lead "the jury to a result it otherwise might not have reached." Id. at 448.

We have addressed this issue in more recent decisions. In State v. Dehart, a police officer testified that he spoke to one person who had received information from another person that identified the defendant. State v. Dehart, 430 N.J. Super. 109, 113 (App. Div. 2013). This led the officer to obtain a photograph of the

defendant to place in a photo array. Ibid. We applied the principles discussed in Bankston and Branch and held that despite trial counsel's failure to object at trial, the "admission was not harmless error under the circumstances[.]" Id. at 115. As in this case, the defendant's conviction in Dehart was based on an identification made through the photo-array that was created from unreliable hearsay evidence. Specifically, the suspect in Dehart was unrecognizable on the surveillance video, and nothing linked the defendant to the crime until an anonymous source told one person, who then told the police officer, that the defendant was the culprit. Ibid. We held that "[p]ermitting this double hearsay into evidence deprived defendant of his right to confrontation." Ibid. Because the "identification was the sole basis for [the] defendant's convictions," we reversed and remanded the case for a new trial. Id. at 116.

Here, Rivera's identification of defendant using the photo-array was the principal legal issue at trial and the only evidence directly linking him to the assault. Rivera and Rafferty made clear to the investigating officers at the scene that they could not identify the assailant. Defendant was not mentioned as a suspect until the anonymous woman provided the police officer with defendant's name and his photograph from his Instagram account. Although the precise information this unidentified individual relayed to the police was not revealed at trial, Detective Abate's testimony provided a sufficient basis from which the jury could infer it

24

supported the State's case against defendant. Detective Abate testified that police officers at the scene "spoke to one female who didn't want to get involved" in the case. The implicit message sent by this hearsay testimony violated defendant's right to a fair trial because it denied him the right to confront this anonymous alleged eyewitness. This is the type of irreparable prejudice the Court found unacceptable in <u>Bankston</u>. 63 N.J. at 271. Without this photo-array, which was constructed using this unverifiable information from an anonymous non-testifying individual, Rivera would have been unable to identify defendant.

Finally, although not raised by defendant, we are compelled to note the references to statements attributable to Rafferty, the person who was standing outside the bar when Rivera was attacked. Rafferty did not testify at trial. Instead, he provided a formal statement to the investigators that described what he allegedly saw at the time of the attack. Detective Abate testified that the officers who responded to the scene spoke to both Rivera and Rafferty. Abate also reviewed Rafferty's statement during his testimony and stated that Rafferty was unable to identify the attacker. Rafferty told the police officers at the scene that neither he nor Rivera had ever seen the attacker before that night. Because Rafferty did not testify, any testimony describing what he said to police investigators raises the same hearsay concerns discussed at length earlier in this opinion. On remand, the trial judge should be mindful to avoid repeating these errors.

A-0427-16T1

We reverse defendant's conviction, and remand the matter for a new trial because the identification process used by the law enforcement investigators relied on incompetent, unreliable hearsay account from an unidentified alleged eyewitness. The police investigator who created a photo-array that included defendant's photograph, testified before the jury that he relied on statements made by an "anonymous female" to implicate defendant. His testimony violated the Sixth Amendment's Confrontation Clause and our Supreme Court's holding in State v Bankston, 63 N.J. at 271. This evidence was "of such a nature as to have been clearly capable of producing an unjust result," Rule 2:10-2, and consequently denied defendant's right to a fair trial. In this light, we decline to consider the remaining arguments defendant raised in this appeal.

Reversed and remanded. We do not retain jurisdiction.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

A-0427-16T1