**NOT FOR PUBLICATION WITHOUT THE**
**APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-3943-16T1

STATE OF NEW JERSEY,

      Plaintiff-Respondent,

v.

WILLIE H. HYMON, JR.,
a/k/a CHARLES HYMON,
WILLIAM H. HYMAN,
WILLIE H. HYMAN, WILLIE
H. HYMON, and WILLIAM
HYMAN, JR.,

      Defendant-Appellant.

_____

        Submitted December 12, 2018 – Decided April 23, 2019

        Before Judges Accurso, Vernoia and Moynihan.

        On appeal from Superior Court of New Jersey, Law Division, Burlington County, Indictment No. 17-01-0026.

        Joseph E. Krakora, Public Defender, attorney for appellant (Rebecca L. Gindi, Assistant Deputy Public Defender, of counsel and on the brief).

Scott A. Coffina, Burlington County Prosecutor, attorney for respondent (Nicole Handy, Assistant Prosecutor, of counsel and on the brief).

PER CURIAM

Defendant Willie H. Hymon, Jr., was charged in a superseding indictment with first-degree robbery, in violation of N.J.S.A. 2C:15-1(a)(1) (count one); first-degree kidnapping, in violation of N.J.S.A. 2C:13-1(b)(1) (count two); and second-degree burglary, in violation of N.J.S.A. 2C:18-2(a)(1) (count three), in connection with a home invasion during which he and Urie Ridgeway[1] allegedly: struck the victim with a wooden log and metal pipe, and later with a soda can; threatened his life; took several items including the victim's money, cell phone, car keys and car, and a bottle of Maker's Mark bourbon; and duct-taped him to a chair. Considering the State's theories that defendant acted both as a principal and Ridgeway's accomplice as to each charge, the jury convicted defendant on all counts. He was sentenced to an aggregate prison term of thirty years. On appeal, defendant argues:

> POINT I
>
> BECAUSE THE JURY WAS NEVER INSTRUCTED THAT ITS VERDICT COULD NOT BE INFLUENCED BY PASSION, PREJUDICE, OR

---

[1] Ridgeway pleaded guilty to first-degree robbery three months prior to defendant's trial.

SYMPATHY, AND BECAUSE THE TRIAL WAS RIFE WITH IMPROPER APPEALS TO THE JURORS' SOCIETAL DUTY, FEAR OF THE DEFENDANT, AND SYMPATHY FOR THE VICTIM, THE DEFENDANT WAS DENIED HIS RIGHT TO A FAIR AND IMPARTIAL TRIAL.

    A.    By Omitting A Critical Portion Of The "Criminal Final Charge[,]"[] The Jury Was Never Instructed That Passion, Prejudice, And Sympathy Could Not Influence Its Verdict.

    B.    The Prejudice From The Court's Charge Error Was Compounded By The Judge's And Prosecutor's Improper Calls To Arms And The Prosecutor's Repeated Appeals To The Jurors' Sympathy and Fear.

POINT II

BY INTRODUCING EVIDENCE THAT NON-TESTIFYING WITNESSES PROVIDED INCULPATORY STATEMENTS ABOUT THE DEFENDANT'S GUILT, THE STATE VIOLATED THE DEFENDANT'S CONFRONTATION RIGHT, THE RULE IN STATE V. BANKSTON, AND THE RULES OF EVIDENCE.

POINT III

THE TRIAL COURT'S FAILURE TO INSTRUCT THE JURY ON HOW TO EVALUATE STATEMENTS OF THE DEFENDANT AND ITS MISCHARACTERIZATION OF THE EVIDENCE IN ITS IDENTIFACTION CHARGE DENIED THE DEFENDANT A FAIR TRIAL AND REQUIRES REVERSAL.

A-3943-16T1

POINT IV

DEFENDANT'S AGGREGATE THIRTY-YEAR SENTENCE IS MANIFESTLY EXCESSIVE AND SHOULD BE VACATED BECAUSE THE COURT ENGAGED IN IMPROPER DOUBLE COUNTING AND FAILED TO CONSIDER THE LIKELIHOOD THAT THE DEFENDANT WILL BE SERVING THE REMAINDER OF HIS LIFE IN PRISON.

Although we are not persuaded by defendant's argument in Point I, we agree, in part, with the arguments advanced in Points II and III and are compelled to reverse.

I.

Defendant conceded in his reply letter brief that, contrary to his initial assertion that the trial judge omitted "a critical portion" of the final charge, the judge did instruct the jury that bias, sympathy and prejudice were not to play any part in their deliberations. Defendant still argues that the judge's opening instruction, prior to jury selection, together with improper remarks by the assistant prosecutor in both his opening and closing statements, were "calls to arms" that deprived defendant of a fair trial.

Defendant did not object to any of the remarks. We therefore review the remarks under the plain error standard, that is, whether the instruction or

prosecutorial comments, or both, were "clearly capable of producing an unjust result . . . ."  R. 2:10-2.

Turning first to the judge's instruction, we perceive defendant culls only selective segments of the judge's instruction on jury service and here presents them out of context.  Defendant emphasizes that portion of the instruction in which the judge rhetorically asked, "Who protects us from the acts of wrongdoers which, if not addressed[,] would go unpunished and result in community fear and anarchy?" and another reference to addressing "acts of wrongdoers."  Viewing the jury charge as a whole, State v. Thomas, 187 N.J. 119, 134 (2006), however, the judge presented a fair and balanced presentation about jurors' duties.

The judge commented on the jury's role to protect against perils presented by both overzealous prosecution and criminal acts:

> We all think that our personal freedom and our liberty is protected by our armed forces.  And indeed, they do protect our personal freedom and our liberty.  But they protect us from an external threat.  Who then protects us from an internal threat?  Who protects us from the possible tyranny of a government that might attempt to unfairly charge and punish a citizen?  Who protects us from the acts of wrongdoers which, if not addressed would go unpunished and result in community fear and anarchy?  The answer is that the duty of protecting that greatest asset which we have, our personal freedom and

A-3943-16T1

our liberty, rests with the weakest branch of the government, the judiciary.

The trial judge went on to explain that jurors were temporary members of the judiciary and that it was their responsibility to "judge the competing interests of the government and those of its citizens. And if we all do that fairly, we can be sure that in the end our government will never become a tyrant and we can be sure that the acts of wrongdoers will be addressed."

"[P]lain error requires demonstration of 'legal impropriety in the [jury] charge prejudicially affecting the substantial rights of the defendant and sufficiently grievous to justify notice by the reviewing court and to convince the court that of itself the error possessed a clear capacity to bring about an unjust result.'" State v. Chapland, 187 N.J. 275, 288-89 (2006) (quoting State v. Hock, 54 N.J. 526, 538 (1969)). Defendant has failed to show any impropriety in the judge's remarks, much less one that amounted to plain error.

Defendant also complains that prejudice engendered by the judge's "charging error was compounded further by the [assistant] prosecutor's flagrant and repeated call to arms, appeals to the jurors' sympathy for the victim and fear of the defendant." A conviction may be reversed where the prosecutor engaged in conduct so egregious in the context of the trial as a whole that defendant was deprived of a fair trial. State v. Wakefield, 190 N.J. 397, 437-38 (2007). In

6

determining whether a prosecutor's misconduct warrants reversal, we consider: "(1) whether defense counsel made timely and proper objections to the improper remarks; (2) whether the remarks were withdrawn promptly; and (3) whether the court ordered the remarks stricken from the record and instructed the jury to disregard them." State v. Frost, 158 N.J. 76, 83 (1999). A defendant's failure to object contemporaneously deprives the trial court of the "opportunity to ameliorate any perceived errors." State v. Feal, 194 N.J. 293, 312 (2008).

Where, as here, a defendant fails to object, the court can infer that the remarks or error were of no moment in the context of the trial. State v. Ingram, 196 N.J. 23, 42-43 (2008). "Any error or omission shall be disregarded by the appellate court unless it is of such a nature as to have been clearly capable of producing an unjust result. . . ." R. 2:10-2. Under the harmless error standard, there must be "some degree of possibility that [the error] led to an unjust verdict. The possibility must be real, one sufficient to raise a reasonable doubt as to whether [it] led the jury to a verdict it otherwise might not have reached." State v. Bankston, 63 N.J. 263, 273 (1973).

Prosecutors have considerable leeway in summarizing the State's case, State v. Williams, 113 N.J. 393, 447 (1988), and may do so graphically and forcefully, State v. Johnson, 287 N.J. Super. 247, 265 (App. Div. 1996); see also

<u>State v. Morton</u>, 155 N.J. 383, 457 (1998) (finding a prosecutor's description of the defendant as a "cold-blooded killer" was not reversible error because the evidence supported the contention and the argument was made in response to the defendant's argument). They may not, however, make "inflammatory and highly emotional" appeals that have the capacity to distract the jury from a fair consideration of the evidence of guilt. <u>State v. W.L., Sr.</u>, 292 N.J. Super. 100, 111 (1996). The prosecutor must confine his or her comments to the evidence and the reasonable inferences that may be drawn therefrom. <u>Johnson</u>, 287 N.J. Super. at 265.

Defendant cites to numerous portions of the assistant prosecutor's opening and closing remarks that he contends appealed "to the jury's sympathy and fear" by stating:

- for thirty minutes the victim "experienced being terrorized by these two suspects";

- "If what you just heard [the State's version of the facts] all sounds like the plot or sounds like a horror movie, this is the reality" that the victim lived on the night of the incident;

- "The victim is going to talk to you about the injuries he suffered, the horror that he went through that night";

A-3943-16T1

- the night of the incident "was a real[-]life horror story for" the victim;

- "What happened to [the victim] in this case was nothing short of torture";

- the victim "talked about the terror that he felt that night when these two individuals were in his home telling him that he was not going to live. . . . At one point [the victim] talk[ed] about Urie Ridgeway picking up a bottle of bleach, they were going to bleach him, absolute terror for [thirty] minutes."

Defendant also claims the assistant prosecutor appealed to the jurors' emotions by describing the lasting impact of the injuries sustained by the victim "all while highlighting his sterling character as a pediatric healthcare provider and Vietnam veteran . . . ."

All of those remarks, however, related to the evidence that defendant or Ridgeway, or both: broke into the victim's home, beat him with weapons, tied him to a chair, threatened him while holding a screwdriver to his eye, threatened to pour a bottle of bleach on him, repeatedly threatened to kill him, ripped the phone out of the wall, and left him bound and bloodied. Further, the remarks related to elements of crimes the jury considered.

In order to prove first-degree robbery, the State had to prove that defendant inflicted or attempted to inflict serious bodily injury. N.J.S.A. 2C:15-1(b).

A-3943-16T1

Likewise, in order to prove criminal restraint – the lesser-included offense to kidnapping – the State had to prove that defendant restrained the victim "unlawfully in circumstances exposing [the victim] to risk of serious bodily injury." N.J.S.A. 2C:13-2(a). In order to negate a jury finding of second-degree kidnapping, the State was required to prove that defendant did not release the victim unharmed and in a safe place prior to apprehension. N.J.S.A. 2C:13-1(c). The term "unharmed" encompasses physical, emotional and psychological harm. State v. Sherman, 367 N.J. Super. 324, 347 (App. Div. 2004).

The assistant prosecutor attributed the victim's inability to work as a nurse anesthetist in the pediatric wing of a hospital to the injuries he sustained at the hands of the intruders, which caused serious bodily injury. The lasting impact of the injuries inflicted during the home invasion directly related to elements of the crimes the jury considered. Defendant failed to mention that the assistant prosecutor's remarks about the injuries the victim suffered when he was shot by a sniper in Vietnam were engendered by defense counsel's cross-examination of the victim about those injuries. The trial judge cautioned the jurors that counsel's comments on the evidence during opening and closing statements were not binding on them and that counsel could not tell the jurors "what the evidence is or is not."

Viewed in that light, we conclude the assistant prosecutor, by confining his comments to the evidence, stayed within the wide latitude to which he was entitled. State v. Mayberry, 52 N.J. 413, 437 (1968). He was "entitled to be forceful and graphic in his summation to the jury, so long as he confine[d] himself to fair comments on the evidence presented." State v. Rose, 112 N.J. 454, 518 (1988) (quoting State v. DiPaglia, 64 N.J. 288, 305 (1974) (Clifford, J., dissenting)).

We look closely at another of the assistant prosecutor's comments that defendant argues tended to equate the victim's experience with that of the jurors:

> This is your home. Your home is supposed to be your refuge. When you go home from work, from school, or from whatever you're doing that day, you go home and you want to relax and you want to feel safe. This man took that from [the victim]. He can't go home and feel safe anymore because of what happened to him that night. And he's never going to get that back, that feeling of security and safety you have in your house.

Under the plain error standard, we determine these brief remarks did not raise "a reasonable doubt as to whether [the comments] led the jury to a verdict it might not have otherwise reached." Bankston, 63 N.J. at 273. Emotional and personalized arguments inviting jurors to consider how they would respond to a situation suggested by the evidence is improper. State v. Blakney, 189 N.J. 88, 95 (2006). Here, however, the assistant prosecutor merely contrasted the

11

psychological impact the invasion had on the victim with the security normally enjoyed in a home. The use of "you" and "your" was unfortunate, as it may appear that the assistant prosecutor was trying to connect the victim with the jurors, but the general tenor of the brief comment did not draw the jurors into the victim's shoes.

So too, the assistant prosecutor should not have told the jury in his opening statement that "when you return at the end of all the presentations of the evidence and the instruction of the law, to the only fair and just verdict, and that is a verdict that . . . brings justice to the victim." And he should not have reprised that theme in his summation: "I submit to you, as I did in the beginning, that this was a real life horror story for [the victim] and you have the opportunity to write the last chapter in that story. And I ask you to do that by bringing justice to the victim." But these two brief references, made a week apart, likewise do not amount to plain error. Unlike the cases relied upon by defendant, the assistant prosecutor did not exhort the jury to "send a message." See State v. Rose, 112 N.J. 454, 520-21 (1988) (finding the prosecutor's comments inflammatory where he told the jury "[y]ou must send a message out to everybody outside in this community"); see also State v. Hawk, 327 N.J. Super. 276, 282 (App. Div. 2000) (concluding the prosecutor's comments were

improper when he stated to the jury that by returning a guilty verdict the jury would send the message that "this community will not tolerate distributors and sellers of [drugs]"); State v. Goode, 278 N.J. Super. 85, 90 (App. Div. 1994) (finding impropriety in the prosecutor's comment that the jury's participation in the matter was their opportunity to "make a difference in [their] community"). Also unpersuasive is defendant's reliance on State v. Rodriguez, 365 N.J. Super. 38, 52 (App. Div. 2003), where the prosecutor disparaged the defendant's assertion of an insanity defense, concluding his summation by urging the jury to consider the evidence and "[l]et the battle for justice be won." The court reversed the defendant's conviction because the prosecutor's statements implied that justice could be served only if they "found defendant guilty; and justice would not be serviced if the jury found defendant not guilty by reason of insanity." Id. at 52-53. Here, the assistant prosecutor did not say or imply that justice would be disserved if the jurors adopted defendant's misidentification defense. The prosecutor's comments are not reversible error.

## II.

Defendant also contends that the admission of evidence from non-testifying individuals violated his right to confront witnesses as guaranteed by the Sixth Amendment to the United States Constitution, U.S. Const. amend. VI,

13

and Article I, Paragraph 10 of the New Jersey Constitution, N.J. Const. art. I, ¶ 10, as well as the Rules of Evidence. We review that evidence, to which no objection was lodged, under the plain error standard. R. 2:10-2.

A Medford Township detective sergeant testified that two women contacted the police department about the identity of the two suspects and the composite sketches that were made at the victim's direction and released to the public. The detective sergeant met with the women "[t]o attempt to locate the victim's stolen car." Although the assistant prosecutor advised the detective sergeant not to get "into details of the conversation with any of those individuals" during his testimony, the detective said he came away with reason to believe the car might be found "in the area around Mount Holly."

Another Medford detective testified that after the composite sketches were released, a member of law enforcement provided "information that was helpful in [the] investigation" and other phone calls from members of the public provided "very helpful" information "in identifying the suspects in this case": defendant and Ridgeway. That detective also testified that he received information from another witness, whom he fully named, and from one Stella – who wished to remain anonymous because she feared retaliation – that was consistent with information provided by other witnesses, including a testifying

A-3943-16T1

witness; he said Stella added substantially to that "consistent information." Although the court stopped the detective from saying what Stella told him, he testified he went to Mount Holly that day and located the victim's stolen car.

Testimony was also elicited about information provided by defendant's brother, William Hymon (William). The detective sergeant, after admitting on cross-examination that he mistakenly took William into custody thinking he was one of the perpetrators, testified on redirect that he received information during the course of the investigation that led him to defendant. He also said that investigators – he did not recall if he was one of them – spoke with William who "provide[d] information that was useful to this investigation . . . ultimately leading to the arrest of his brother." The detective sergeant later admitted that William was "interviewed at length about what happened in this case" and that William provided police with information that led the detective sergeant to believe that his brother, defendant, "in fact, [did] it"; "[s]pecifically, that [police] were looking for his brother."

Justice Albin, writing for our Supreme Court in State v. Branch, eloquently recognized, "Both the hearsay rule and the right of confrontation protect a defendant from the incriminating statements of a faceless accuser who remains in the shadows and avoids the light of court." 182 N.J. 338, 348 (2005).

A-3943-16T1

The admission of evidence from a non-testifying witness is, therefore, generally prohibited. Id. at 357; see also N.J.R.E. 801(c); N.J.R.E. 802. But the Confrontation Clause, which guarantees a defendant the right to cross-examine witnesses, "does not condemn all hearsay." Branch, 182 N.J. at 348. "A defendant's confrontation right must accommodate 'legitimate interests in the criminal trial process,' such as established rules of evidence and procedure designed to ensure the efficiency, fairness, and reliability of criminal trials." Id. at 349 (quoting State v. Garron, 177 N.J. 147, 169 (2003)).

Thus, a police officer may state that he relied "upon information received" when explaining why he approached a suspect or went to the scene of a crime, without violating hearsay rules. Bankston, 63 N.J. at 268. While such testimony is admissible to show the officer did not act arbitrarily, the hearsay rules are violated "when the officer becomes more specific by repeating what some other person told him concerning a crime by the accused." Ibid. Even so, it is the creation of the inference, not necessarily the specificity of the statements made, that determines whether the hearsay rules were violated. See State v. Irving, 114 N.J. 427, 447 (1989). In short, a police officer cannot "imply to the jury that he possesses superior knowledge, outside the record, that incriminates the defendant." Branch, 182 N.J. at 351.

A-3943-16T1

While it may have been permissible for the detectives to testify that they were provided with information that led them to the location of the stolen car,[2] the elicited hearsay information interjected much more into the trial. The two women not only provided the general location of the car, the detective sergeant said the women contacted the department "about the identity of the two suspects and the composites," leading to the inference that they identified the suspects in the sketches that the State contended depicted defendant and Ridgeway. Those same composites were the basis of the other "useful information" gathered from law enforcement and the public that helped identify the suspects. Again, the weight of that evidence – the sketches, based on information supplied by the victim – was bolstered by the inference provided by those non-testifying witnesses to police. The information supplied by Stella, which was consistent

---

[2] In Branch, the Court explained that in situations other than a photographic identification, police officers may use "the phrase 'based on information received' . . . to explain their actions, but only if necessary to rebut a suggestion that they acted arbitrarily and only if the use of that phrase does not create an inference that the defendant has been implicated in a crime by some unknown person." Id. at 352. The Court, however, explained that an exception may exist where the defendant suggests an officer acts arbitrarily or with ill motives, allowing an officer to explain his actions despite the prejudice to the defendant. Ibid. Defendant does not argue that there was no suggestion that the officers acted arbitrarily or with ill motive, so as to render unnecessary the introduction of Bankston-type evidence. As such, we will not address that issue. State v. Robinson, 200 N.J. 1, 20 (2009).

with and "substantially added" to the testimony of a testifying witness, effectively bolstered that witness's testimony, as did the "consistent" information supplied by the other non-testifying witness whom the detective named.

Moreover, William's information, relayed by the detective, "ultimately" led to defendant's arrest. The police were told that they were "looking for" William's brother. The detective said that information led him to believe that defendant "did it."

We also note that much of William's hearsay information was elicited after the detective sergeant was cross-examined about his arrest of William and the detective's subsequent discovery that William was not defendant. Contrary to the State's contention on appeal, the defense's cross-examination did not invite error. We see no reason why it was necessary for the State to present William's incriminating evidence in response to that cross-examination.

In Bankston, the Court overturned the defendant's conviction when a detective's testimony created the "inescapable inference" that the detective was informed from an unknown source that the defendant committed the crime. 63 N.J. at 271. At trial, the detective stated that the defendant fit the description of the person the police were looking for. Id. at 266-67. The Court stated that

"[w]hen the logical implication to be drawn from the testimony leads the jury to believe that a non-testifying witness has given the police evidence of the accused's guilt, the testimony should be disallowed as hearsay." Id. at 271.

In State v. Irving, 114 N.J. at 446-47, a detective testified that, after canvassing the neighborhood in search of leads in a robbery, he decided to "focus[] on the defendant as the subject of his investigation and placed his picture in the [photographic] array" to be shown to two witnesses, who subsequently picked the defendant's photo. The Court found that the detective's testimony created the "inescapable inference" that "an informant had told [the detective] that [the] defendant committed the crime"; thus, violating the principles of Bankston. Id. at 446-47.

The bulk of the hearsay information testified to by the detectives in this case either impliedly or directly suggested that non-testifying witnesses implicated defendant in the crimes. The extra weight attributed to the composite sketch and the implication of defendant by William – the person the defense, in advancing the misidentification defense, contended was responsible for the crimes – was clearly capable of producing an unjust result, R. 2:10-2, especially, as we will explain, considering the State's proofs against defendant.

III.

Defendant contends his trial was tainted because the trial court: (1) failed to instruct the jury on how to assess the written and oral statements allegedly made by defendant; and (2) erroneously instructed the jury that the victim made an out-of-court identification of defendant when no such identification occurred. Although defendant did not object to the jury instruction, there is a presumption that a defendant is unfairly prejudiced by erroneous jury instructions on material points because "proper jury instructions are essential to a fair trial." State v. Baum, 224 N.J. 147, 159 (2016) (quoting State v. Bunch, 180 N.J. 534, 541-42 (2004)).

Defendant argues that the trial court erred by omitting the charge instructing the jury how to evaluate admitted evidence: two letters and envelopes allegedly written by defendant and testimony about oral threats to and demands of the victim attributed to defendant during the home invasion.[3] About a week after the attack, and after defendant was in custody in the Burlington County Jail, the victim received a letter expressing the author's remorse for

_____

[3] Defendant was said to have demanded jewelry, money and guns. Threats the victim recounted included: "you're going to get murdered tonight"; "I don't want to read my name in the newspapers"; "if you don't go to the police, you'll get your car back"; and "we know where you live."

violating the victim's "home and peace of mind." The six-page letter was signed, "Sincerely, Willie." The return address on the envelope was defendant's home address, and "BCJ" was written on the back of the envelope. The Medford detective received another hand-written letter from defendant requesting a receipt for defendant's belongings in police custody, including two bicycles. Subsequently, the detective served defendant with "legal paperwork" compelling defendant to provide handwriting exemplars. Defendant provided exemplars of the alphabet in both upper and lower case letters, but refused to reproduce the letter sent to the victim, a copy of which was included with the paperwork.

At trial, a United States Secret Service Forensic Document Examiner testified as an expert in handwriting analysis. He explained that he examined the letter sent to the victim, the envelope in which it was sent, the letter sent to the detective and defendant's handwriting exemplar. The document examiner concluded, while the letters and envelopes were "probably of common authorship," he could not determine whether defendant was the author because of a lack of handwriting exemplars.

A-3943-16T1

The omitted instruction – commonly known as a <u>Hampton</u>-<u>Kociolek</u>[4] charge – advises the jury its "function [is] to determine whether or not [any written or oral] statement was actually made by the defendant, and if made, whether the statement or any portion of it is credible." <u>Model Jury Charges</u> (Criminal), "Statements of Defendant" (rev. June 14, 2010). As to oral statements, particularly, jurors are told:

> In considering whether or not an oral statement was actually made by the defendant, and, if made, whether it is credible, you should receive, weigh and consider this evidence with caution based on the generally recognized risk of misunderstanding by the hearer, or the ability of the hearer to recall accurately the words used by the defendant. The specific words used and the ability to remember them are important to the correct understanding of any oral communication because the presence, or absence, or change of a single word may substantially change the true meaning of even the shortest sentence.
>
> You should, therefore, receive, weigh and consider such evidence with caution.
>
> [<u>Ibid.</u>]

After the judge's discussion of each statement and an instruction on how to assess a statement's credibility, the instruction continues in pertinent part: "If, after consideration of all these factors, you determine that the statement was not

---

[4] <u>State v. Hampton</u>, 61 N.J. 250 (1972); <u>State v. Kociolek</u>, 23 N.J. 400 (1957).

22                                                              A-3943-16T1

actually made, or that the statement is not credible, then you must disregard the statement completely." Ibid.

Whenever a defendant's oral or written statements are introduced, trial courts are mandated to give the instruction whether requested by defendant or not. State v. Jordan, 147 N.J. 409, 425, 428 (1997). The failure to give the charge

> is not reversible error per se. It is reversible error only when, in the context of the entire case, the omission is "clearly capable of producing an unjust result. . . ." R. 2:10-2. That problem would arise most frequently when the defendant's statement is critical to the State's case and when the defendant has challenged the statement's credibility.
>
> [Id. at 425.]

The omission of the charge "imposes a significant burden on the State to demonstrate that such error is not plain error." Id. at 430.

The credibility of the statements is not really in issue in this case. Thus, contrary to the State's assertion, the general credibility instruction did not rectify the court's failure to give the Hampton-Kociolek charge. See State v. Setzer, 268 N.J. Super. 553, 563-65 (App. Div. 1993) (holding the omission of a Hampton charge was not clearly capable of producing an unjust result when a general credibility charge was given); see also Jordan, 147 N.J. at 429. The

issues are whether defendant wrote the letters and was the person present at the crime scene who made the statements.

The authorship of the letters was hotly contested. Not only was the State's expert unable to conclude defendant wrote the letters, a jail employee called by the defense testified that the jail did not have a procedure to identify the sender of outgoing mail from the jail. As the State noted in its merits brief, defense counsel, in questioning the victim, highlighted that the letter to him "was dated a week after the crime at a time when the details of the crime were known to many and were supplied to the media by law enforcement." Those letters were critical evidence in this case where the defense was misidentification. In the letter to the victim, the writer apologized and confessed, giving details about the events leading up to, during and after the crimes that matched the victim's account. The letter to the detective, likewise, linked defendant to the crime, asking for the return of the bicycles found near the crime scene; the detective testified that the tracks he found, shortly after the crimes were committed and leading to the bicycles' location, were fresh. He also testified that he did not recover fingerprints after he processed the bicycles.

In arguing that the failure to give the charge was not plain error, the State points to the other evidence against defendant: the victim's detailed description

24 <span>A-3943-16T1</span>

of the attack; the victim's in-court identification of defendant who was not wearing a mask during the crimes; a witness's testimony that on the night the crimes occurred, he recognized the men depicted in the composite sketches shown on a television news program and, on the night prior thereto, saw the victim's car parked in front of a house in which he saw defendant and Ridgeway drinking from a bottle of Maker's Mark bourbon, which the witness later retrieved from defendant's garbage and handed over to the police; Ridgeway's possession of black gloves and a black beanie hat, similar to garb the victim believed was worn by an assailant, as well as the victim's car keys and iPhone in the box with which it was taken; defendant's possession of gloves and a jacket similar to that the victim believed was worn by an assailant; DNA evidence matching defendant to one cigarette butt found in the victim's car and Ridgeway to another butt which also contained a minor DNA profile matching defendant; and DNA evidence indicating there were three contributors to one swab taken from the Maker's Mark bourbon bottle, from which defendant and Ridgeway could not be excluded as partial contributors and another which matched only Ridgeway as one of three contributors.

"If . . . the defendant's statement is unnecessary to prove defendant's guilt because there is other evidence that clearly establishes guilt, or if the defendant

25

has acknowledged the truth of his statement, the failure to give a <u>Hampton</u> charge would not be reversible error." <u>Jordan</u>, 147 N.J. at 425-26. We do not conclude the State's evidence, aside from the statements, clearly establishes his guilt. The victim was not one-hundred percent certain that the clothes found in defendant's and Ridgeway's possession were those worn by the perpetrators. The witness's testimony and DNA evidence, linking defendant to the victim's car and the Maker's Mark bottle, and the victim's property in Ridgeway's possession, perhaps links defendant to stolen property but does not directly establish defendant's presence in the house during the crimes. And the victim was unable to identify defendant from a photo array.

Furthermore, the value of the victim's in-court identification was enhanced by the trial court's erroneous instruction that the victim made an out-of-court identification of defendant. During the identification jury instruction, the court advised that the State presented the victim as a witness and he identified defendant in court as the person who committed the crime. The court went on to instruct that "[t]he State also presented the testimony that on a prior occasion before this trial [the victim] identified the defendant and aided in the preparation of a composite drawing." Where, as here, the defense was misidentification, the erroneous instruction on that material issue is presumed

to be reversible error.  State v. Marshall, 173 N.J. 343, 359 (2002).

Contrary to the State's argument that the court's comment about the out-of-court identification was "a fleeting mention in the entirety of his charge regarding identification," the judge went on to reference the out-of-court identification six more times in instructing the jury how to evaluate the identifications.  We note the State's argument that the instruction was generally accurate because the victim testified that when he viewed the array:

> I saw [defendant], that I thought was [defendant] and some of these pictures look incredibly similar to one another.  And I kept staring at these two and it was, I could take a guess I could say it's that one, and I have a [fifty] percent chance of being correct.  And I kept looking at the two.  And then I just bailed.  I said I can't say one hundred percent of the time that's him because they look – what if I pick the wrong one and that guy gets in trouble?  So I chose instead of guessing at a 50/50 chance of being right I just said no, I can't say [one hundred] percent of the time. And they look close to together.  The one I was leaning to was [defendant]
> . . . .

The emphasis by the court on the out-of-court identification, however, could very well have swayed the jury to think that that non-identification was actually an out-of-court identification that they should consider.

Without the statements, the paucity of clear evidence of defendant's guilt leads us to conclude that the failure to give the Hampton-Kociolek charge also

27

warrants reversal. This is one of those "rare cases" where the failure to give both of those charges, in combination with the erroneous identification charge and the admission of the hearsay information that either impliedly or directly suggested that non-testifying witnesses implicated defendant in the crime, constrain us to reverse defendant's convictions.

## IV.

In light of our decision, we need not consider defendant's Point IV sentencing arguments.

Reversed and remanded. We do not retain jurisdiction.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION