**NOT FOR PUBLICATION WITHOUT THE**
**APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-3475-16T4

STATE OF NEW JERSEY,

     Plaintiff-Respondent,

v.

CARLTON T. JAMES, a/k/a
JAMES CARLTON, and
TASHON MOORE,

     Defendant-Appellant.

_____

Submitted May 7, 2019 – Decided June 4, 2019

Before Judges Fisher and Geiger.

On appeal from Superior Court of New Jersey, Law Division, Camden County, Indictment No. 13-08-2362.

Joseph E. Krakora, Public Defender, attorney for appellant (Alyssa A. Aiello, Assistant Deputy Public Defender, of counsel and on the brief).

Mary Eva Colalillo, Camden County Prosecutor, attorney for respondent (Patrick D. Isbill, Assistant Prosecutor, of counsel and on the brief).

PER CURIAM

The Supreme Court recognized in State v. Branch, 182 N.J. 338, 350-51 (2005), that an accused's constitutional confrontation rights are violated when police officers suggest or imply during trial testimony that they possess "superior knowledge, outside the record, that incriminates the defendant" or when they convey "directly, indirectly or by inference, [incriminating] information from a non-testifying declarant." Defendant claims the State violated these rights during his trial through testimony elicited from an investigating officer. Satisfied after careful review that the trial judge's rulings and instructions adequately steered the police testimony away from these pitfalls and sufficiently cautioned the jury about drawing such an inference, we affirm, although we must remand for a correction of the judgment of conviction.

Testimony adduced at trial revealed the nature of the December 29, 2012 incident that led to this prosecution. After Devon Williams hit Anthony Graham over the head with a bottle, Anthony's two brothers – Gregory and Jermaine – drove from Philadelphia and, with Anthony, arrived at a Camden bar late that evening to confront Williams. The Graham brothers entered the bar and asked Williams to talk with them. They all went outside, but Williams first walked around the corner and spoke to another group while the brothers waited out front. Williams then walked back to the Graham brothers with the other group in tow.

Gregory later testified that the brothers tried to pull Williams aside to talk, but Williams' group wouldn't allow it. During the ensuing argument, Gregory noticed a "short dude" with a "long beard" in the group wearing a white shirt and hoodie who, with hand on waist, was walking behind his brothers. Williams told the man to "Chill, Cool."

Taking a cue from Jermaine, Gregory, according to his own trial testimony, turned and began to walk away. Within seconds, he heard four or five gunshots as Gregory ran toward Jermaine's car; once in the car, Gregory realized he had been shot. The brothers drove to a nearby hospital, where Gregory was treated for gunshot wounds to his leg, arm and knee.

That night, police interviewed Gregory, but he was unable to identify the shooter because he had been walking away when the shots were fired. He did, however, provide Detective Shawn Donlon with a description of the short, dark-skinned man with the long beard. Jermaine advised the detective that he believed that man's nickname was "Cool C," and he later testified that he heard Williams refer to that same man as "Cool C."

After interviewing the Graham brothers, Detective Donlon spoke about the case with Lieutenant William Frampton, who recognized "Cool C" as an alias for defendant and so informed Donlon. Jermaine was able to identify

3

defendant from a photo array as the shooter. He also made an in-court identification of defendant as the shooter during the trial.

Defendant was indicted on six counts, including second-degree aggravated assault, N.J.S.A. 2C:12-1(b)(1), third-degree aggravated assault, N.J.S.A. 2C:12-1(b)(2), fourth-degree aggravated assault, N.J.S.A. 2C:12-1(b)(4), second-degree possession of a weapon for an unlawful purpose, N.J.S.A. 2C:39-4(a), second-degree unlawful possession of weapons, N.J.S.A. 2C:39-5(b), and second-degree certain persons not to have weapons, N.J.S.A. 2C:39-7(b). Prior to trial, defendant unsuccessfully moved to suppress the out-of-court identifications made by Jermaine and Anthony Graham.

Defendant was convicted on all counts at the conclusion of an eight-day jury trial. At sentencing, the judge found defendant to be a persistent offender and imposed an extended term. N.J.S.A. 2C:44-3(a). The judge imposed a fifteen-year prison term, subject to an eighty-five percent period of parole ineligibility on the second-degree aggravated assault conviction, and a consecutive seven-year term, with a forty-two-month period of parole ineligibility, on the second-degree unlawful possession conviction. The judge also imposed lesser concurrent prison terms on those other convictions that did not merge.

4

In appealing, defendant argues in his multi-faceted first point that his right to a fair trial was prejudiced by police testimony elicited by the prosecution:

> I. REVERSAL IS REQUIRED BECAUSE THE TRIAL COURT ERRONEOUSLY DENIED [DEFENDANT'S] MOTION FOR MISTRIAL MADE WHEN GREGORY TWICE TESTIFIED TO DAMAGING HEARSAY. IN THE ALTERNATIVE, REVERSAL IS REQUIRED BECAUSE THE CUMULATIVE PREJUDICE RESULTING FROM GREGORY'S HEARSAY TESTIMONY AND DAMAGING INFERENTIAL HEARSAY ELICITED BY THE PROSECUTOR DURING HER EXAMINATION OF DETECTIVE DONLON DEPRIVED [DEFENDANT] OF HIS CONSTITUTIONAL RIGHTS TO A FAIR TRIAL AND DUE PROCESS OF LAW.

We reject this.

Defendant also complains about the sentence imposed, arguing:

> II. THE AGGREGATE SENTENCE – TWENTY YEARS OF IMPRISONMENT WITH MORE THAN SIXTEEN YEARS OF PAROLE INELIGIBILITY – CONSTITUTED AN ABUSE OF DISCRETION.

> III. THE MATTER MUST BE REMANDED FOR THE TRIAL COURT TO CORRECT AN ARITHMETIC ERROR CONTAINED IN THE JUDG[]MENT OF CONVICTION.

We reject Point II, but the State concedes, and we agree, that for the reasons asserted in Point III a remand is necessary to correct the judgment of conviction.

5

I

In his first point, defendant contends that Gregory Graham testified to what his brother Jermaine saw and, in so doing, impermissibly bolstered Jermaine's credibility with hearsay testimony. He also argues that Detective Donlon's testimony inferentially conveyed information provided to him by Devon Williams, who did not testify, thereby injecting impermissible hearsay into the record. We first discuss the general principles that apply to defendant's contentions and then discuss the two subparts to defendant's Point I separately.

A

In a criminal proceeding, both the United States Constitution and the New Jersey Constitution guarantee an accused the right of confrontation. U.S. Const. amend. VI; N.J. Const. art. I, ¶10. The right to confront witnesses is an essential element of a fair trial and requires that the accused be given the opportunity to defend against any accusers through cross-examination. Branch, 182 N.J. at 348-49. The admission of hearsay generally violates an accused's confrontation rights. Crawford v. Washington, 541 U.S. 36, 51 (2004). But, if an out-of-court statement falls within a recognized exception to the hearsay rule and is non-testimonial, this constitutional right is not infringed. Davis v. Washington, 547 U.S. 813, 821 (2006).

A-3475-16T4

A defendant's right to confrontation is generally implicated when "a witness refers to specific information from a non-testifying third party." State v. Weaver, 219 N.J. 131, 152 (2014). That is true even when a witness implies the possession of "superior knowledge, outside the record, that incriminates the defendant." Branch, 182 N.J. at 351. But it is permissible for a police officer to testify about the reasons for approaching a suspect or investigating a crime scene when explaining it was done "upon information received." State v Bankston, 63 N.J. 263, 268 (1973). Such an explanation is admissible for the sole purpose of showing "that the officer was not acting in an arbitrary manner or to explain his subsequent conduct." Ibid.

In Bankston, for example, detectives received a tip and went to a Newark bar to question the defendant, who matched a description given by an informant. Id. at 265. The officers arrested the defendant after finding sixteen envelopes of heroin under a pair of gloves near the defendant's seat at the bar. Ibid. At trial, one of the arresting officers was allowed to testify that the police went to the bar "based on information received," that they were looking for a "certain individual," and that they had a "description of his clothing." Id. at 266. The Court affirmed the reversal of the defendant's convictions because the State led the jury to believe that an informant, who did not testify, told the police that the

defendant had committed a crime. <u>Id.</u> at 271. The State argued that the statement was admissible to offer an explanation for why the police went to that tavern, but the Court determined there was no need to explain their actions because the defendant did not allege they were acting arbitrarily, <u>id.</u> at 271-72, and, so, testimony that the police went to the bar based "upon information received" would have been sufficient, <u>id.</u> at 272.

In <u>Branch</u>, the Court held that a detective's testimony explaining that the suspect's picture was included in a photo array because of "information received" constituted inadmissible hearsay and violated the Confrontation Clause. 182 N.J. at 342. The Court reasoned that because the detective received the tip before the identification and because there was no testimony or evidence other than that identification, the jury could only speculate that the detective had superior knowledge obtained through hearsay. <u>Id.</u> at 347-48. The defendant's right to confrontation was violated because the nameless informant did not testify and was not subject to cross-examination.

B

Unlike <u>Bankston</u> and <u>Branch</u>, the jury here was not left with the inescapable inference that defendant's identity was provided by an unnamed, non-testifying witness. The jury, for instance, heard Jermaine testify that he

8

heard defendant referred to as "Cool C" on the night of the shooting and "assumed that . . . was [defendant's] name." Jermaine also testified he told Detective Donlon about the nickname and provided a physical description. At some point after the interview, Detective Donlon spoke to Lieutenant Frampton who knew defendant from his community policing activities. At trial, Lieutenant Frampton testified that defendant was known in the community as "Cool C."[1] Rather than being left with an inference that the police chose to investigate defendant because a shadowy declarant – not presented for cross-examination – implicated defendant in the crime, the jury heard witnesses link defendant to the shooting, and defendant had the opportunity to confront and cross-examine those witnesses.

Bankston and Branch also recognize that the State should be allowed some leeway in this manner so that it might describe the investigative process when the defense has questioned its investigatory tactics. Branch 182 N.J. at 349-50; Bankston 63 N.J. at 271-72. Defense counsel's opening statement questioned

---

[1] The State recognized it would be prejudicial to allow Detective Donlon to testify about personal knowledge of defendant's nickname through prior investigations. Instead, the State called Lieutenant Frampton who had personal knowledge that defendant's friends and other community members called him "Cool C." This evidence was admissible under N.J.R.E. 803(c)(19). See State v. Perez, 150 N.J. Super. 166, 170-71 (App. Div. 1977).

the validity of the investigation, asserting that the brothers could not identify the shooter; counsel also argued that the brothers went to the hospital where Gregory was being treated but never got the opportunity to speak with the investigating officer. Yet, as the defense continued to argue,

> days later mysteriously, the police decided they knew who did it. As a result, the police went over the bridge and went into Philadelphia, armed with a picture of [defendant] because they had decided, the police, that he had done it.

Defense counsel also questioned the professionalism of the photo array procedure and the reliability of the identification.

Although effective advocacy for defendant, this opening statement afforded grounds for the State's elicitation of evidence about the investigation without violating Bankston and Branch. Under different circumstances, it may have been impermissible for an officer to describe his investigation by testifying that he spoke to a non-testifying witness. But the defense's challenge to the adequacy or propriety of the investigation presented a legitimate purpose for the testimony in question.

To the extent that any error seeped into defendant's trial, we find it harmless because there can be no "reasonable doubt" about whether, in light of all the other evidence properly elicited, the inferential references to other out-

of-court statements or information "led the jury to a result it otherwise might not have reached." Bankston, 63 N.J. at 273; see also Fahy v. Connecticut, 375 U.S. 85, 86-87 (1963) (expressing the harmless error test as requiring an examination into "whether there is a reasonable possibility that the evidence complained of might have contributed to the conviction"). And, even when inadmissible evidence is elicited, the harmful effect may be avoided through curative instructions that are "firm, clear, and [uttered] without delay." State v. Vellejo, 198 N.J. 122, 134-35 (2009); see also State v. Prall, 231 N.J. 567, 586 (2018).

In this regard, we note that defendant argues on appeal that Gregory was erroneously permitted to utter two hearsay statements. He testified, "I guess my brother seen that he had a pistol or a gun . . .," and, a short time later, "[s]o like my brother seen that the guy had a gun . . . ." The judge sustained the defense objections and instructed the jury after each statement. The judge's immediate instructions clearly directed the jury to disregard Gregory's statements about what his brother might have said or seen. These instructions sufficiently protected defendant against any manifest injustice.

C

We reach the same conclusion as to defendant's arguments about the alleged seepage of hearsay information during Detective Donlon's testimony in a way that violates the principles established in <u>Branch</u> and <u>Bankston</u>.

Defendant argues that this seepage occurred perniciously, first with the detective's testimony that his role as primary investigator was to "conduct[] interviews" and look for witnesses. Then, as the direct testimony evolved into more specific areas, the detective revealed that he spoke with the victim and his brothers, including Anthony, who did not testify at trial:

Q. And who was [Gregory] with? Was he with –

A. At the hospital, Jermaine and Anthony.

Q. And when you met with them, what did you do?

A. I took a statement from them.

. . . .

Q. And how cooperative were they at the time?

A. Very cooperative.

He also revealed that as part of his investigation he interviewed Devon Williams, who also did not testify at trial.

The problem, according to defendant, is that the detective not only correlated what he learned from them as part of his testimony – thereby providing hearsay information to the jury – but also that he conveyed that information through his testimony about a surveillance video that captured the disputants outside the Camden bar. For example, the detective was asked about whether the video captured images of "[t]he possible suspect," and he added that the video "coincide[d] with what the brothers told [him] that evening." So, while defense counsel had the opportunity to cross-examine two of the brothers about the information provided to the detective, he did not have that opportunity with the third brother who did not testify.

Defense counsel objected when any of the detective's testimony suggested he was aware of statements that were not going to be subjected to cross-examination. For example, one defense objection was followed by the prosecutor's agreement to limit the scope of the direct examination. When the judge inquired of defense counsel whether she had any objection to the prosecutor's proposal, defense counsel again pressed her point, arguing that "if the Branch rule is violated, yes, [I object to] any reference to information [coming from the detective] outside of the ken of the jurors."

To avoid the problem, the judge instructed the prosecutor to "simply go to the next step in [the detective's] investigation without saying how he got there," and what followed reveals the effectiveness of the objection in avoiding a Branch violation:

> Q. Okay. I'll show this to the jury on the overhead. And if you may, Detective, can you point out the person who you believed was the shooter in the still shot?
>
> A. You want me to get up or – the one with the white T-shirt, his head would be facing I guess to the right, has a beard.
>
>     . . . .
>
> Q. And how did you come to believe that?
>
> [DEFENSE COUNSEL]: I'm gonna object to the hearsay.
>
> THE COURT: All right, the question doesn't necessarily call for hearsay.
>
> [PROSECUTOR]: No, Your Honor.
>
> A. Through statements and description given.
>
> [DEFENSE COUNSEL]: Inferential hearsay.

Yet, defense counsel understandably persisted after that last answer to claim that the testimony included "[i]nferential hearsay." That led to another discussion at sidebar:

THE COURT: Well, he can testify to whether as he looks at this photo there's anybody there that has characteristics with what descriptions were that he received. Would you not agree with that?

[DEFENSE COUNSEL]: I actually don't agree with the [c]ourt. In other words, what's the purpose of that? Why not get it from the people who gave . . . the descriptions and they –

. . . .

THE COURT: All right, so I'm gonna strike his answer and have [the jury] disregard anything and move on in the other direction that we just discussed, if you choose to.

[PROSECUTOR]: Is it proper to say did you come to determine that that was a suspect, what did you base it on, it would have been the descriptions provided.

[DEFENSE COUNSEL]: Your Honor, I just don't know why this needs to come from the detective. Isn't what the State wants to show coming from the witnesses who were there?

THE COURT: But [the detective] can describe the investigation he undertook, what he's doing step by step, and that's what he does, he does gather information from people and does take other steps based on that. And the State wants to show he did, I'm assuming, a sensible investigation. They're allowed to put that on, and that's not a hearsay problem.

With that, the prosecutor informed the judge that she would "just . . . go in

another direction," and the judge instructed the jury to "disregard the witness's

15

answer to the question about the basis for identifying that person that he just talked about."

Certainly, the manner in which the prosecution sought to proceed throughout the detective's testimony had the potential to violate the constitutional principles outlined in <u>Branch</u>. But sound objections were interposed and hearsay seepage was prevented by the judge's sustaining of those objections and his instructions to the jury. We see no error.[2]

## II

In his second point, defendant argues that the judge abused his discretion in finding and applying aggravating factors one and two, and also that we should remand count five for the trial court to reconsider whether that count should run consecutively to count one. We find insufficient merit in Point II to warrant further discussion in a written opinion. <u>R.</u> 2:11-3(e)(2). We add only the following few comments.

A sentencing judge enjoys "a far-ranging discretion as to the sources and types of evidence used to assist him or her in determining the kind and extent of punishment to be imposed." <u>State v. Davis</u>, 96 N.J. 611, 619-20

---

[2] To the extent other sub-arguments might be discerned from defendant's contentions in his Point I, we find they have insufficient merit to warrant further discussion. <u>R.</u> 2:11-3(e)(2).

16

(1984).  Although we may modify a sentence when a sentencing judge is "clearly mistaken," State v. Jabbour, 118 N.J. 1, 6 (1990), we may not replace that judgment with our own.  State v. Lawless, 214 N.J. 594, 606 (2013).  Beyond that, a sentence will be reversed only if it "shocks the judicial conscience." State v. O'Donnell, 117 N.J. 210, 215-16 (1989).

When passing sentence, a judge must "state on the record the reasons for imposing the sentence." N.J.S.A. 2C:43-2(e); accord R. 3:21-4(g).  When a prison sentence is imposed, the court must also consider "the defendant's eligibility for release under the law governing parole and the factual basis supporting its findings of particular aggravating or mitigating factors affecting sentence." N.J.S.A. 2C:43-2(e); accord R. 3:21-4(g).  The sentence must be reasonable "in light of all the relevant factors considered." State v. Natale, 184 N.J. 458, 488 (2005).  To arrive at a reasonable sentence, the judge must balance the factors and determine "whether there is a preponderance of aggravating or mitigating factors." State v. Kruse, 105 N.J. 354, 359 (1987).  This calls for a thoughtful analysis of each applicable aggravating and mitigating factor not merely "counting [ ] one against the other." State v. Denmon, 347 N.J. Super. 457, 467-68 (App. Div. 2002).

In sentencing defendant, the judge found and applied aggravating factors one, two, three, six and nine. N.J.S.A. 2C:44-1(a)(1), (2), (3), (6), and (9). In weighing the first and second aggravating factors, the judge explained "there really was minimal interaction" between defendant and the victim, that "[t]here was no heated exchange or provocation justifying a shooting." Relying on evidence adduced during the trial, the judge explained that defendant "fired four shots at the back of the victim," who suffered wounds to his arm, knee, and thigh. The judge also recognized from the trial testimony that the victim "suffered both physical and mental distress," noting he incurred "physical scarring" and a "bullet remains in his arm." Consequently, the judge concluded the first two aggravating factors were entitled to "high weight."[3]

Defendant argues that the first aggravating factor – the nature and circumstances of the offense, N.J.S.A. 2C:44-1(a)(1) – requires an offense that is malicious or carefully calculated. We disagree; factor one allows for the consideration of "conduct in excess of that required to commit the crime." State v. Locane, 454 N.J. Super. 98, 124 (App. Div. 2018). The jury found that defendant fired four shots on a public street at three fleeing men. The

_____

[3] The judge stressed, however, that he considered the victim's mental distress "only in [a] very limited[,] general sense" and gave "it extremely light weight relative to everything else."

surveillance video may not have shown the shooting itself, but it does reveal a large number of bar patrons, some of whom exited the bar to observe the disturbance before it turned violent. The footage also reveals that the bar is located on a busy city street with considerable car and foot traffic, notwithstanding the late hour. Given this level of activity and the danger defendant's actions posed to the public, the excessiveness of defendant's conduct amply supported a finding of aggravating factor one.

Aggravating factor two is implicated when a victim is "substantially incapable of exercising normal physical or mental power of resistance." N.J.S.A. 2C:44-1(a)(2). When considering factor two, a sentencing judge should undertake a "pragmatic assessment of the totality of harm inflicted" on the victim. State v. Kromphold, 162 N.J. 345, 358 (2000). A victim's vulnerability may warrant application of this factor. State v. Kruse, 105 N.J. 354, 362-63 (1987) (holding the trial court properly considered the victim's vulnerability as an aggravating factor because he was unarmed when the defendant acted with a bat). Beyond defendant's obvious advantage of having a gun against three unarmed and retreating men, Gregory was not even facing defendant when shot. The judge was entitled to apply aggravating factor two.[4]

---

[4] We find no error in the judge's application of the other aggravating factors.

The only mitigating factor the judge found was that the victim induced or facilitated the commission of the crime. N.J.S.A. 2C:44-1(b)(5). Defendant argues that its application is inconsistent with the judge's findings on aggravating factors one and two. We disagree. The judge expressed that he interpreted this factor broadly and gave defendant the benefit of that broad interpretation because the case was distinguishable from "those where the perpetrator plans an attack over time and then carries it out against a particular victim or lies in wait for a potential victim to appear." To be sure, the record reveals that the Graham brothers sought out Williams to confront him about his earlier fracas with Anthony, so the judge had a factual basis for applying the fifth mitigating factor. But that doesn't mean that such a finding precludes the judge's findings on aggravating factors one and two.

                                   III

Defendant argues in Point II, and the State concedes, that the judgment of conviction incorrectly identifies the period of parole ineligibility. The judge sentenced defendant to a fifteen-year prison term on the second-degree aggravated assault conviction, which also carried an eighty-five percent period of parole ineligibility under the No Early Release Act, N.J.S.A. 2C:43-7.2. The judge accurately calculated defendant would be ineligible for parole under this

count for twelve years and nine months. He also imposed a consecutive seven-year term on the fifth count, with forty-two months of parole ineligibility, to run consecutively to the other count. The aggregate prison term is twenty-two years, and the aggregate period of parole ineligibility is sixteen years and three months of that term. The judgment of conviction mistakenly identifies the latter period as seventeen years and nine months. We remand for the limited purpose of correcting the judgment of conviction on this point.

* * *

The judgment of conviction is affirmed but the matter remanded for a correction of the mistake in the judgment referred to in Section III of this opinion. We do not retain jurisdiction.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

A-3475-16T4